AIME VALCOUR *v.* VILLAGE OF MORRISVILLE.

October Term, 1938.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed November 1, 1938.

*Fleetwood & Parker* and *Guy M. Page* for the petitionee.

*Finn & Monti* for the petitioner.

SHERBURNE, J. This case has been here before. See 108 Vt. 242, 184 Atl. 881. Petitionee is a municipal corporation and operates an electric utility within the corporation limits and distributes and sells electric energy outside these limits. The

petitioner owns and resides upon a farm in Stowe not far from petitionee's high tension line conveying current to the electrical department of the village of Stowe. Prior to August 10, 1930, the petitionee was delivering current to said farm. On that date the barn upon said farm was destroyed by a fire, which was attributed to the negligence of the petitionee in the delivery of such current. See *Valcour* v. *Village of Morrisville*, 104 Vt. 119, 158 Atl. 83. Since the fire, although requested, the petitionee has refused to supply current to the petitioner. This is a proceeding to compel the petitionee to supply such current. When this case was here before the petition was based upon the provisions of P. L. 6452 and 6453, but in affording the relief prayed for the public service commission, after making findings of fact, the substance of which is given in the report of that case, based its jurisdiction upon other grounds. That order of the commission was reversed and the cause was remanded.

Doubtless prompted by a suggestion in the opinion in that case, to which we will later refer, the petitioner asked and obtained leave to file an amended petition with the commission after the remand. This amended petition, partly in addition to facts formerly alleged, shows that since the petitionee became engaged in the business of generating electricity in 1895, it has increased the capacity of its plant from 80 horse power to upwards of 4,000 horse power, and now has an investment of approximately $600,000 and generates approximately 5,250,000 kilowatt hours of electric energy annually, and has net earnings of over $35,000; that it supplies electricity to the municipal electric plants of the villages of Stowe, Hyde Park, Johnson and Hardwick for sale to their inhabitants; that it supplies all of the electric energy used by upwards of 140 farmers on approximately 147 farms outside of the petitionee village in the vicinity of Cady's Falls, Morristown Corners, the Laport Road, Elmore Road and village, Randolph Road, Elmore Mountain Road, and in the vicinity of petitionee village, and including neighboring farmers located upon both sides of the petitioner and all the farmers using electric energy between the villages of Morrisville and Stowe, all at uniform rates; that it sells, and heretofore has sold, outside of the petitionee village limits more than fifty per cent of the electric energy generated by it to the public generally, and to all persons, companies, associations and

corporations, municipal, public and private, that desired the same, indiscriminately at regular rates; that it wholly dominates the territory covered so that other utilities are precluded from entering therein as competitors or to serve the petitioner; that it has transmission lines within 500 yards of the petitioner's buildings, and wires extending to such buildings; and that it heretofore has been, and now is, able to supply electric energy to the petitioner. The amended petition further shows that the development of petitionee's plant has created a surplus which is not, and has not been temporary, casual and incidental, but that it is far beyond what is or will be required to serve the needs of the petitionee village, and that although the petitionee ostensibly only sells its surplus, it has in reality created a surplus far in excess of the needs of the inhabitants of said village.

The amended petition was demurred to, the demurrer was overruled, and the petitionee was again ordered to supply electric energy to the petitioner upon the same terms and conditions whereby it sells such energy to consumers residing in the vicinity of the petitioner. From this order the petitionee has appealed.

The questions presented for review are those raised by the demurrer. The first, third and seventh grounds of demurrer are:

> 1. ''The matters contained in said petition are res adjudicata between the parties as appears from the records and files in said cause.''
> 3. ''Petitioner is estopped by the record in this proceeding from asserting that petitionee is under duty to serve the petitioner as prayed in said petition.''
> 7. ''It appears from the record that the Commission is without jurisdiction, right or power to grant the relief sought by the petition.''

As to these grounds it is sufficient to point out that when this case was here before we mentioned that there were no findings upon certain matters, and suggested that a case might be presented in which we should determine whether the surplus from a municipal utility may or may not be devoted to public use without express legislative authority.

98

■■ The fourth ground of demurrer is:

"The record shows that the petitioner has had his day in court, including hearing of all the evidence presented, and determination of all facts material to his petition, and he is not entitled to a rehearing and redetermination of said issues under an amended petition."

If there is any merit to this contention it should have been raised upon an exception to the order allowing the amended petition to be filed. On demurrer to an amended pleading, the question for consideration is the sufficiency of the pleading itself, and not the right of the party to file it. 49 C. J. 556.

The other grounds of demurrer go to the merits, and insist that under the law of the case the allegations are insufficient to warrant the relief prayed for; that considered in connection with the record in this proceeding they establish that the petitionee is not a public utility at the place where petitioner seeks service; and that the petition does not allege such matters as in the circumstances of the case entitle the petitioner to the relief prayed for.

■■ It is appropriate to quote from *Valcour* v. *Village of Morrisville,* 104 Vt. 119, 131, 132, 158 Atl. 83, 86, as follows:

"In acquiring and operating any kind of a public utility a municipal corporation acts in its private or proprietary as distinguished from its public or governmental capacity, since the furnishing of water or lights to its inhabitants is in no sense a governmental function. It holds the property comprising such utility, primarily, for its own and its inhabitants' use. If the operation of the utility for the primary object for which it is created produces a surplus of water, light, etc., dictates of common business prudence require that it be disposed of and its proceeds devoted to the use of the municipality or its inhabitants. That it has the right to dispose of such surplus within its corporate limits without special legislative authority, we entertain no doubt; and we see no logical reason why it may not likewise dispose of such surplus outside its limits, since its right to do so

> in either case is purely incidental to the primary
> object for which it was created, and in neither is
> it discharging a governmental function. We hold,
> therefore, that the defendant had the right to dis-
> pose of its surplus electricity outside its own limits
> and to extend its equipment as might be necessary
> for that purpose.''

That case holds that in such operations the defendant was not acting as a public utility, but that its relations with its customers were purely contractual, and that it had no authority as a public utility to operate outside its limits. In the declaration in that case the plaintiff sought damages because of the alleged negligence of the defendant, and the case came up on a demurrer to the replication, so a case such as the instant one was not presented. Whether the then defendant was a private contractor or a utility at the place in question could make no difference in the result, and the holding that the defendant had no authority as a public utility to operate outside its limits was *obiter*. The instant case presents a situation in which we should examine anew whether or not this village can devote its surplus to public use outside its limits, and if it has so devoted it. Unless it can and has, it cannot be compelled to furnish electric energy to the petitioner under sec. 6452 or chapter 250 of the Public Laws, for to do so would be a vain attempt to convert a private contractor into a public utility. This case in 108 Vt. 242, 251, 184 Atl. 881.

So far as here material P. L. 6452 reads:

> ''A person, association, company or corporation
> engaged in the business of generating in this state
> electric energy and distributing the same for gen-
> eral sale for heating, lighting or power purposes
> or for any other public use, if and when requested
> so to do, at all reasonable times, shall sell and dis-
> tribute the same to any and all persons * * * that
> desire to use the same within this state for either
> or any of such purposes; subject, however, to such
> reasonable limitations as to the amount of energy
> to be furnished a purchaser, and which shall in no
> case be beyond what is reasonably necessary; and

> also as to the distance from the generating plant
> or from its lines of transmission that such energy
> shall be delivered," etc.

Under secs. 6454 to 6456 and chapter 250 of the Public Laws jurisdiction in such matters is given to the public service commission.

▄ We held in *Rutland Railway Light & Power Co.* v. *Clarendon Power Co.*, 86 Vt. 45, 56, 83 Atl. 332, 44 L. R. A. (N. S.) 1204, that in the absence of charter limitations, a corporation which engages in the business of generating and distributing electric energy for general sale for power purposes devotes its property to a public purpose as much as if it limited its business to the sale of current for lighting purposes, and that such business is affected with a public interest, both as regards the law of regulation and the law of eminent domain. As stated in the opinion that holding puts all corporations engaged in generating electricity for general sale into one and the same class, without regard to the presence or absence of special provisions in their charters regulating the conduct of their business.

▄ On page 50 (83 Atl. on page 334) this opinion comments upon Prof. Wyman's then recent work on Public Service Corporations and says that "he makes the whole question of public use, or what is the same thing, public calling, depend upon whether the calling involves a matter of public necessity and is monopolistic in character, in view of the economic, industrial and commercial conditions of the times. Taking monopoly as the criterion by which a given calling is to be tested, he determines its character as public or private, and classifies it accordingly. He divides monopolies into three classes: natural, state granted and virtual; and his conclusion is that when one engages in a business which is assignable to either of these classes, his business becomes affected with a public interest, and the rights of the public therein may be protected by legislative action, and the conduct of the business regulated accordingly. That a business purely private is not subject to such regulation is plain enough. It is only when the public has an interest in it that it has any rights to be so protected. Nor is the situation changed (according to Prof. Wyman's theory) if that business for one reason or another, becomes locally or temporarily

monopolistic, as where a local merchant for the time being controls the whole available supply of a given commodity; it is still a private enterprise, and (in the respect now under consideration) free from legislative regulation or control. On the other hand, a public calling may become locally or temporarily competitive, as where two railroads come to serve the same territory; but such do not thereby lose their character as public service corporations, and they remain subject to regulation and control." *Munn* v. *Illinois,* 94 U. S. 113, 24 L. ed. 77, is cited as based upon this theory, and it is said that this theory affords a test of public use at the same time, logical, workable and satisfactory so far as the matter of regulation is concerned.

In *Munn* v. *Illinois, supra,* it is said:

> "Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use, in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control."

This often cited case concerned the transacting of business as public warehousemen. In support of the conclusions there reached the opinion quotes from a number of authorities, including *Allnutt* v. *Inglis,* 12 East 527, and from the extracts therefrom we quote the following:

By Lord Ellenborough:

> "There is no doubt that the general principal is favored, both in law and justice, that every man may fix what price he pleases upon his own property, or the use of it; but if for a particular purpose the public have a right to resort to his premises and make use of them, and if he will take the benefit of that monopoly, he must as an equivalent, perform the duty attached to it on reasonable terms."

And by LeBlanc, J.:

> "Then admitting these warehouses to be private property, and that the company might discontinue them, or that they might have made what terms they pleased in the first instance, yet having as they now have, this monopoly, the question is, whether the warehouses be not private property clothed with a public right, and if so, the principle of law attaches upon them."

The case of *New York & Chicago Grain & Stock Exchange* v. *Chicago Board of Trade,* 127 Ill. 153, 19 N. E. 855, 2 L. R. A. 411, 11 A. S. R. 107, cites the quotation first above taken from *Munn* v. *Illinois, supra,* in support of its conclusions. In that case it was held that the Chicago Board of Trade cannot, after having so conducted its affairs for a long term of years as to create a standard market for agricultural products, and in concert with telegraph companies built up a system for the instantaneous and continuous indication of that market, until such system has become impressed with a public interest, be allowed to discriminate between persons, and say that one shall and another shall not receive the market reports, when all are equally willing to conform to reasonable rules on the subject and pay for the information.

In determining if a corporation is a public utility the important thing is what it does, not what its charter says. *Terminal Taxicab Co.* v. *Kutz,* 241 U. S. 252, 60 L. ed. 984, 36 Sup. Ct. 583, Ann. Cas. 1916D, 765.

Under our statutes and the foregoing authorities it is clear that if a private corporation were doing what is alleged it would be properly classed as doing a business subject to regulation by the public service commission. We have here a case where the petitionee has a virtual monopoly in the distribution and sale of electricity in a large part of Lamoille County, and where, if it has the power, it has dedicated its surplus to the public use. It generates its electricity by water power and has more than a temporary surplus. Even if it has overbuilt is no reason why it should let its surplus power go to waste. We are faced with an unusual situation where over the years a municipality has built up a profitable business in selling large

quantities of electric energy outside its limits, and we can see no reason why this large surplus may not be devoted to the public use until such time, if ever, that the needs of the inhabitants of the municipality require all of the electric energy generated. To assure an adequate market for all of its surplus it may have been good business practice to supply all who require electric energy in this large territory, both for the purpose of selling as much energy as possible, and for the purpose of preventing competitors from entering the territory and taking business which the petitionee was prepared to handle. So long as it serves and monopolizes this territory it should not be permitted to discriminate between those desiring such service. Because it has no special legislative authority to dispose of its surplus outside its corporate limits entitles it to no special favors. It cannot take the advantages without assuming the liabilities usually incident to such operations.

As further showing that the petitionee has dedicated its surplus to public use outside its corporation limits, the amended petition alleges that the petitionee has furnished to the public service commission information required under P. L. 6088 concerning the condition, operation, management, expense of maintenance and operation, cost of production, rates charged for service or for product, contracts, obligations and financial standing of the corporation, at various times during the past ten years or more; that through its manager it has notified the commission of the happening of accidents within the State upon its lines and plant, pursuant to P. L. 6089; that it has complied with P. L. 6100 and filed with the commission from time to time as required by it schedules open to public inspection showing all rates, including joint rates, for any service performed or any product furnished by it within the State, and as part thereof, filed the rules and regulations that in any manner affect the general public, or rates charged or to be charged for such service or product; that, as provided by P. L. 6102, it has kept and now keeps on file in every station or office where payments are made by consumers or users thereof, open to the public, and in such form and places as to be readily accessible to inspection by the public, copies printed in plain type of so much of its schedules as the commission has deemed necessary; that it has, from time to time, applied to the commission for permission to con-

struct, maintain and operate power lines in order to convey electric energy to various places outside of its limits, to run its power lines in the highways and across the highways, to connect its power lines with the power lines of other villages and public utilities, and that it has particularly applied for and received permission to construct, maintain, operate and connect its power lines and equipment outside its limits on six occasions, the places and dates being specifically enumerated, all between 1918 and 1928; and also that applications and permits to construct and maintain wires in other places outside its limits were made and issued from time to time.

The sections of the Public Laws above cited are a part of .chapter 250, and their provisions only apply to those subject to supervision under that chapter. By sec. 6085, a part of that chapter, the public service commission is given supervision of all those, including municipalities, engaged in the manufacture, distribution or sale of electricity directly to the public, or to be ultimately used by the public, for lighting, heating or power, including supervision of their use and occupancy of the public highways. This section further provides that in the case of those whose principal business is other than the manufacture, distribution or sale of electricity directly to the public, or ultimately to be used by the public, for lighting, heating or power, they shall be under the supervision of the commission only as to that part of their business which has to do with such manufacture, distribution or sale of electricity. So far as the manufacture, distribution or sale of electricity for use within the petitionee's corporate limits are concerned, this section gives the commission supervision, but if, as it contends, it is doing a private business outside, it is not subject to supervision as to that part of its business. Yet the foregoing allegations are sufficiently broad to show that it has treated this part of its business as also subject to supervision, and so tend to show it has dedicated that business to the public use. *Palermo Land & Water Co.* v. *Railroad Comm.*, 173 Cal. 380, 160 Pac. 228.

Because of what we have already pointed out it is unnecessary to comment upon the other allegations in the amended petition, nor need we determine if the allegation that the petitionee since the enactment of the provisions of P. L. 6453 has erected

and maintained a transmission line for a distance of approximately 625 feet along and in the public highway in the town of Elmore avails the petitioner anything.

*Order affirmed and cause remanded. Let the result be certified to the public service commission.*