**IOWA STATE COMMERCE COMMISSION,**
Appellant,

v.

**NORTHERN NATURAL GAS COMPANY,**
Appellee.

No. 52959.

Supreme Court of Iowa.

Sept. 5, 1968.
Rehearing Denied Dec. 10, 1968.

Leo J. Steffen, Jr., Commerce Counsel, Daniel J. Fay and Susan Thomas, Assistant Commerce Counsel, Des Moines, for appellant.

Eugene Davis, Des Moines, and John B. Will and J. C. Osborne, Omaha, Neb., for appellee.

BECKER, Justice.

Defendant Northern Natural Gas Company is a pipeline company. Its principal business is purchase, transportation and sale of natural gas. It sells high pressure pipeline gas throughout Iowa to wholesale purchasers who sell at retail to the ultimate consumer. Northern also sells gas to two classes of ultimate consumers; i. e. 1) to land owners (usually farmers) located at or near the company's main high pressure line and 2) to main line industrial or commercial users situated outside cities and towns and not within any specific franchise territory serviced by retailers of natural gas.

On August 9, 1966 plaintiff Iowa State Commerce Commission issued an order finding the direct line retail gas sales by Northern subject to regulation under Chapter 490A, Code, 1966. It directed Northern to file tariffs and rules and regulations under which the gas was thus sold and services rendered. Northern refused to do so, contending this part of its business was not subject to Chapter 490A regulation. The Commission sought a mandatory injunction from the district court. The court held with Northern that this phase of its operation was not subject to such regulation. We disagree.

Defendant operates some 20,000 miles of lines of which 5,000 miles are in Iowa. As of December 1966 it had approximately 5,000 "farm tap customers" of which 1740 were in Iowa and 93 nondomestic (industrial and commercial) retail customers were also in Iowa.

I. The bulk of defendant's business is at wholesale. Regulation of sale of piped gas *for resale* is wholly within the jurisdiction of the Federal Power Commission and is not in dispute here. Panhandle Eastern Pipeline Co. v. Public Service Commission of Indiana, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128. Eighty-five percent of defendant's Iowa *retail gas pipeline* business, done in 92 communities through Peoples Natural Gas Company (a wholly owned subsidiary), is regulated by plaintiff and is not in dispute here. The other fifteen percent of defendant's retail business is the direct line tap business referred to above. Plaintiff asserts the right to regulate that business also. Defendant denies that right and thus we have the issue.

The problem presented has been narrowed by defendant to one of statutory construction. Defendant concedes the state of Iowa has the power to regulate direct sales to ultimate consumers from interstate transmission lines. This is the holding in Panhandle Eastern Pipeline Co. v. Public Service Commission of Indiana, supra, and Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993.

■ II. A public utility can do business in areas not covered by its utility rights and obligations. In so doing the utility acts in a private capacity as distinguished from its public capacity and as to such actions it is subject to the same rules as any other private person. City of Phoenix v. Kasun, 54 Ariz. 470, 97 P.2d 210; City of Des Moines v. City of West Des Moines, 239 Iowa 1, 30 N.W.2d 500; Northern Natural Gas Company v. Roth Packing Company, 8 Cir., 323 F.2d 922.

A significant example of this type of business is defendant's business dealing in liquefied petroleum gas (bottled gas) which both parties agree is not covered by Chapter 490A regulation. There is no dispute as to the above principle. The controversy centers on whether the sale of gas from high pressure pipelines directly to the consumer is included in the regulatory statute, Chapter 490A, section 1 of which reads in pertinent part:

"Applicability of authority. The Iowa state commerce commission shall regulate the rates and services of public utilities to the extent and in the manner hereinafter provided.

"As used in this chapter, 'public utility' shall include any person, partnership, business association, or corporation, domestic or foreign, owning or operating any facilities for:

"1. Furnishing gas by piped distribution system or electricity to the public for compensation.

"* * *

"Mutual telephone companies in which at least fifty percent of the users are owners, telephone companies having less than two thousand stations, municipally-owned utilities, unincorporated villages which own their own distribution system, and co-operative corporations or associations shall not be subject to the rate regulation provided for in this chapter; * * *"

■ The legislature has defined public utility for the purposes of Chapter 490A in the above section. We therefore start with the familiar statement that the legislature is its own lexicographer when it deems it advisable to define a word or phrase. Graham v. Worthington, 259 Iowa 845, 146 N.W.2d 626, 632.

III. There is no doubt defendant is a "corporation", "furnishing gas", "for compensation." The key phrases remaining are "to the public" and "by piped distribution system."

■ Defendant argues strongly that the term "furnishing gas * * * to the public" means service to, or readiness to serve, an indefinite public (or portion of the public as such) which has a legal right to demand and receive its services or commodities. The term precludes the idea of service which is private in nature and is not to be obtained by the public. A public utility may perform acts in a private, as distinguished from public, capacity, in which case it is subject to the same rules as any other private person. Citing 43 Am.Jur., Public Utilities, Section 2 and City of Des Moines v. City of West Des Moines, supra, as authority.

The Des Moines v. West Des Moines case involved a sewer agreement between the cities and one of the challenges was: "a contract for public utility service and rates therefor cannot by contract be fixed for perpetually renewable ten-year periods." The court held that while the business of disposing of sewerage is a public utility business, the City of Des Moines had no duty to dispose of West Des Moines' sewer-

age and thus the contract between the parties was private and in no way subject to rate regulation by Des Moines. In so deciding we said at page 7: "The authorities quite generally refuse to attempt an all-inclusive definition of the term 'public utility.' 43 Am.Jur., Public Utilities and Services, § 2; 51 C.J. 4. 'As its name indicates, the term * * * implies a public use and service to the public.' 43 Am.Jur. [section 2], supra.

" * * *

"But even though the service be impressed with a public interest the question arises, what public? It is said 'the principal determinative characteristic * * * is that of service to, or readiness to serve, an indefinite public * * * *which has a legal* *right to demand and receive* its services or commodities.' 43 Am.Jur. [section 2], supra. (Italics supplied.)"

As between the two contracting cities we refused to impose public utility concepts on the agreement. This holding is not determinative of our problem. The question here is not the validity of the agreement between contracting parties but whether the legislature has exercised its admitted right to regulate those contracts. In that sense the instant case is also clearly distinguishable from Northern Natural Gas Co. v. Roth, supra. Here we have a different problem of statutory construction in connection with the question "What public?". It is a problem faced by other courts in closely analogous situations.

In Industrial Gas Company v. Public Utilities Commission, 135 Ohio St. 408, 21 N.E.2d 166; 29 P.U.R.,N.S., 89 the commission sought to regulate a pipeline company. The company had a line 50 miles long, serving 19 industrial and 12 private consumers, all under written contracts stipulating the price to be paid for the gas. The 12 private consumers were given the privilege of buying gas in consideration for the right-of-way grants. The industrial purchasers obviously constituted the bulk of the company's business. The company did not hold itself out to serve either the public or the users of industrial gas generally and had refused or failed to agree with, and consequently, did not serve certain industrial users.

In holding the company subject to utility regulation the court there said at page 168 of 21 N.E.2d: "The appellant with its fifty miles of pipelines running through four counties supplying nineteen industrial plants with natural gas, was rendering a service to a substantial part of the state that would ordinarily be serviced by public utilities under regulatory restrictions.

" * * * *

" * * * Yet, it is not a controlling factor that the corporation supplying service does not hold itself out to serve the public generally. It has been held that a business may be so far affected with a public interest that it is subject to regulation as to rates and charges even though the public does not have the right to demand and receive service. (Citing case).

"Regardless of the right of the public to demand and receive service in a particular instance, the question whether a business enterprise constitutes a public utility is determined by the nature of its operations. Each case must stand upon the facts peculiar to it. A corporation that serves such a substantial part of the public as to make its rates, charges and methods of operations a matter of public concern, welfare, and interest subjects itself to regulation by the duly constituted governmental authority. (Citing case). * * * Thus, changing the purpose clause of its charter, refraining from use of the right of eminent domain, avoiding a holding out to serve the public generally, and selling only to select consumers by private contract could be employed as subterfuges by many public utility companies. If the business is still affected with a public interest, it remains a public utility."

In Natural Gas Service Company v. Serv-Yu Cooperative, Inc., 70 Ariz. 235, 219 P.2d 324 a cooperative started a natural

gas distribution business, confining sales *to its members*. On rehearing in holding the co-op a public utility the court at pages 325 and 326 gave weight to the following factors.

"1. What the corporation actually does.

"2. A dedication to public use.

"3. Articles of incorporation, authorization, and purposes.

"4. Dealing with the service of a commodity in which the public has been generally held to have an interest.

"5. Monopolizing or intending to monopolize the territory with a public service commodity. Valcour v. Village of Morrisville, 110 Vt. 93, 2 A.2d 312.

"6. Acceptance of substantially all requests for service. Consolidation Coal Co. v. Martin, 8 Cir., 113 F.2d 813, 817; Wingrove v. Public Service Commission, 74 W.Va. 190, 81 S.E. 734, L.R.A.1918A, 210.

"7. Service under contracts and reserving the right to discriminate is not always controlling. State ex rel. Bricker v. Industrial Gas Co., 58 Ohio App. 101, 16 N.E.2d 218; Industrial Gas Co. v. Public Utilities Commission of Ohio, 135 Ohio St. 408, 21 N.E.2d 166.

"8. Actual or potential competition with other corporations whose business is clothed with public interest. Industrial Gas Co. v. Public Utilities Commission, supra."

■ Analyzing the case by such criterion the court held the co-op was in fact a public utility even though it limited sales to its members and concluded: "Under the issues made in this case we were not called upon to and did not decide that the appellee should or could by any order or statute be required to serve the public generally. What we did and now decide is that appellee Serv-Yu Cooperative, Inc., is a public service corporation subject to the jurisdiction and regulation of the Corporation Commission." So also in this case, we do not decide Northern could or should

be required to service all customer requests directly from its high pressure line. See Elk Run Telephone Company v. General Telephone Co., Iowa, 160 N.W.2d 311 (opinion filed July 18, 1968). We do decide that in servicing over 1800 customers in Iowa in such manner it is a public utility within the meaning of Chapter 490A.

■ Defendant distinguishes the foregoing Ohio and Arizona cases on the basis of language in the statutes and in the Arizona constitution. It is true those documents are broader than the language employed by our legislature but the definition of sales to the public is fully applicable here. We think the distinctions are more illusory than real. The real question is: What does the statutory phrase "to the public" mean? We conclude it means sales to sufficient of the public to clothe the operation with a public interest and does not mean willingness to sell to each and every one of the public without discrimination.

Natural Gas Service Company v. Serv-Yu Cooperative, supra, dealing as it does with cooperatives, illustrates an additional factor to be considered in "constructing" our statute. Admittedly cooperatives do not hold themselves out as ready to serve an indefinite public. In Iowa the legislature quite clearly intended to include cooperatives in its definition of "public utility" because it exempted cooperatives from rate regulation. If cooperatives were not included in the general definition there would be no reason to exclude them as to rates. If cooperatives are included in the general definition of "public utility" as promulgated by the legislature, readiness to serve the general public which has a legal right to demand and receive utility services cannot be a *sine qua non* to the definition. A cooperative need only, and can only, serve its members.

While not "on all fours" both Public Service Comm. v. Panhandle Eastern Pipeline Co., 224 Ind. 662, 71 N.E.2d 117, affirmed 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 and Panhandle Eastern Pipe Line

Co. v. Michigan Public Service Comm., 328 Mich. 650, 44 N.W.2d 324, affirmed 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 support the conclusion reached here. See also Rural Electric Co. v. State Board of Equalization, 57 Wyo. 451, 120 P.2d 741, 747, 751, 122 P.2d 189, "While that feature [whether the public may enjoy the service by right or by permission] frequently comes into prominence, it is, perhaps, not quite correct to call it a 'criterion.' It is, rather, ordinarily, an incidence, a necessary result, an essential feature, of the dedication to public use. * * *

"These cases, we think, clearly establish the law to be that merely because an owner enters into contracts in connection with his service, and in some instances refuses service, is not a controlling factor. If that is correct that must be true also in connection with an owner with limited membership, as in the case at bar, since such limited membership is but another form of an attempted limitation by contract. And turning to the facts in the case at bar, all the prominent factors, announced by the foregoing authorities as indicative of a public utility, are present: (1) Plaintiff deals in a commodity in which the public as a whole is generally interested. (2) It is actually engaged in business and is supplying its commodity to some of the public. (3) It serves a substantial portion of the public, within the meaning of the cases cited."

IV. The cases dealing with this phase of our problem are by no means unanimous. Defendant cites Public Utilities Commission v. Colorado Interstate Gas Co. (1960), 142 Colo. 361, 351 P.2d 241 where the commission attempted to regulate the pipeline sales direct to *eleven* customers for retail consumption. As here, the company was selling at wholesale to most of the cities in its area; i.e. the eastern slope of Colorado.

The difference between sale to eleven customers and over eighteen hundred customers is at once apparent. We do not distinguish the case on that ground, but we should note that except for the cases involving cooperatives no case cited indicates an attempt by a utility to relieve itself from regulation in connection with an enterprise embracing over 1800 customers. The cases cited typically involve a dozen or two customers at most. It was the anticipated unregulated expansion to large numbers which, in part, determined the results reached in Ohio, Michigan and Indiana.

The Colorado case seems to be bottomed on the notion that a company must hold itself out to serve the public indiscriminately in order to be a public utility subject to regulation. "The nature of the service must be such that all members of the public have an enforceable right to demand it." City of Englewood v. City and County of Denver, 123 Colo. 290, 229 P.2d 667, 673 quoted in Public Utilities Comm. v. Colorado Interstate Gas Co., supra, 351 P.2d at p. 248. We reject this rigid test as did the case heretofore noted.

So also the case of Mississippi River Fuel Corp. v. Illinois Commerce Commission, 1 Ill.2d 509, 116 N.E.2d 394 holds contra to our conclusion here. In that case the pipeline company, as here, sold at wholesale to customers for resale and also sold direct to *twenty-three* large industrial consumers. A divided court held because the pipeline company "consistently and with great care confined its industrial gas sales to specific and selected customers, and has done no act by which it has given the reasonable impression that it was holding itself out to serve gas to the public, or to any class of the public, generally.", 116 N.E.2d at 399, the company was not subject to regulation. We find Chief Justice Schaefer's dissent, like that of Justice Doyle in Public Utilities Comm. v. Colorado Interstate Gas Co., supra, more persuasive. Both dissents refuse to place undue emphasis on the test of whether or not there is a holding out of services to the entire public, and both cite the Ohio, Indiana and Michigan cases holding the pipeline company subject to regulation. At page 400 part of Justice Schaefer's dissent should be noted: "Cases in which the

concept of public use has been held to prevent control of essentially private operations such as the incidental sale of water procured or power generated for its own internal use by a concern primarily engaged in other activities, are, in my opinion, wide of the mark. (Cases cited.) Mississippi's entire business is the transportation and sale of gas. To hold that by restricting its industrial sales to a selected group of the most desirable customers, Mississippi can require us to regard such sales as for private use is, in my opinion, to condition the application of the statute upon the willingness of a company to comply with it."

In this regard the intent of the legislature is evidenced by the following sections. "490A.2 Powers—rules. The commission shall have broad general powers to effect the purposes of this chapter notwithstanding the fact that certain specific powers are hereinafter set forth."

"490A.21 Extent of jurisdiction. The jurisdiction and powers of the commission shall extend as hereinbefore provided to the utility business of public utilities operating within this state to the full extent permitted by the constitution and laws of the United States."

Considering the entire chapter and the legislature's announced purpose to give the commission broad powers to effect the purposes of the chapter we hold defendant to be furnishing gas *to the public* for compensation within the meaning of section 490A.1.

V. Defendant contends it is not "furnishing gas by piped distribution system." Much effort and argument is devoted to this proposition in the excellent record and briefs submitted here by both sides. Defendant carefully made a record to point to the differences between low pressure piped distribution used in cities and towns and the direct taps involved here. There is much that is persuasive about the differences and the trial court so found.

Neither the statute nor the dictionaries define "piped distribution system." We find definitions for "pipeline or transmission line", "low pressure distribution system" and "high pressure distribution system" in the American Standard Code For Pressure Piping Systems which was offered in evidence by defendant. They are: "805.62 PIPELINE OR TRANSMISSION LINE is a pipe installed for the purpose of transmitting gas from a source or sources of supply to one or more distribution centers or *to one or more large volume customers* or a pipe installed to interconnect sources of supply. In typical cases pipelines differ from gas mains in that they operate at higher pressures, they are longer, and the distance between connections is greater. \* \* \*

"805.65 LOW-PRESSURE DISTRIBUTION SYSTEM is a gas distribution piping system in which the gas pressure in the mains and services is substantially the same as that delivered to the customer's appliances. In such a system a service regulator is not required on the individual services.

"805.66 HIGH-PRESSURE DISTRIBUTION SYSTEM is *a gas distribution piping system* which operates at a pressure higher than the standard service pressure delivered to the customer. In such a system a service regulator is required on each service to control the pressure delivered to the customer." (emphasis supplied)

■ All three definitions envision a piped distribution system and none limits the term to service of two or more customers off a smaller gas main. We do not feel that the illustrative schematic drawing showing how multiple service is supplied by low pressure systems takes these technical definitions out of the phrase "piped distribution system." Defendant clearly owns and operates a high pressure distribution system as above defined. The definition includes "a gas distribution piping system." While not controlling, we take this to be persuasive evidence that defendant's sales at re-

tail off this system are by piped distribution system and thus are to be regulated.

It seems to us that a "system", even though it utilizes the high pressure gas main, that distributes gas all over the state of Iowa, utilizes thousands of miles of pipe, hundreds of gas pressure regulators or pressure reducers, tap off piping, and furnishes gas to over 1800 customers, can, and should, be called a "piped distribution system" within the meaning of the section.

Defendant's witnesses testified there has been growth the last several years in rural domestic and nondomestic sales since the filing of the petition because of Northern's aggressive expansion program to run laterals to new communities. The reported case Re Northern Natural Gas Company, F.P.C. No. CP 64–228, 57 P.U.R.3d 417, 419 would indicate the company has also been quite aggressive in acquiring the commercial and industrial direct tap customers that numbered 93 at the end of 1966. There the Power Commission found: "We must ask the question whether the sale here in issue would, or could have been made through any of Northern's distributor customers. The record shows that CCA was considering several sites, including some in areas not served by Northern. The lowest price offered CCA by Northern's distributor customers was 34.64 cents per Mcf. Iowa Power and Light Company, an intervener here, actively competed for the sale but proposed a southwestern Iowa location where lower priced gas was available from Natural Gas Pipeline Company of America (Natural), Northern's pipeline competitor. On review of the evidence we are convinced that Northern was justified in concluding that a direct sale was required if CCA's plant was to be located in its area of service." This case involved the Consumers Cooperative Association direct tap which is one of the customers among the 93 heretofore noted. The record here shows revenues accruing to Northern from that operation to be $8000 a day.

In this regard we should note the main line direct tap customer does not always receive his gas at the main line and become responsible for it at that point. From time to time, for large consumers, the pipeline company runs its own line to the plant for direct sales. When it does this it must have Federal Power Commission approval, but it is not otherwise regulated as to such business.

The domestic use tap is no longer confined to property owners who have a right to service by virtue of an easement contract. The determination of easement rights became so complicated that Northern largely dropped easement rights as a requirement and has furnished domestic gas service simply on request if the customer could take care of necessary easements to his property.

Plaintiff commission argues the use of the phrase "furnishing gas by piped distribution system" was used to distinguish piped gas sales from liquefied petroleum gas sales; the phrase simply distinguishes the one from the other and has no further significance. This argument is persuasive but we need not turn our interpretation of the statute on an argument which goes more to motivation than meaning. As indicated, the apparatus supplied by Northern is sufficient to satisfy the phrase "by piped distribution system" and we so hold.

VI. The commission attempted to have the 61st Session of the General Assembly amend section 490A.1 to clarify the statute we now interpret. The legislature took no action. Defendant urges this failure to act as indicative of lack of intent to regulate this portion of their business. It cites no authority for this proposition.

We think the citation of part of 50 Am. Jur., Statutes, section 330, p. 323 is peculiarly applicable here: "There are, however, several decisions holding that, in construing a statute, rejected amendments may not be considered, or at least should be given little weight, since the court can have no

means of knowing the reasons that influenced the legislature in such rejection."

■ We have cited this section with approval but under different statutory historical situations, Independent School District of Cedar Rapids v. Iowa Employment Security Commission, 237 Iowa 1301, 25 N.W.2d 491 and Lever Bros. Co. v. Erbe, 249 Iowa 454, 87 N.W.2d 469. In this case we have no means of determining why amendment was not passed. The reason may well have been that the legislature thought the statute clearly subject to the interpretation we give it here. Naught in the record appears to the contrary. We do not consider this circumstance controlling.

For the reasons given we reverse and remand for judgment consistent with this opinion. Reversed and remanded.

All Justices concur, except GARFIELD, C. J., and STUART and SNELL, JJ., who dissent.

STUART, Justice (dissenting).

I respectfully dissent. We are concerned here with contractual direct line sales of natural gas. As appellee concedes the State of Iowa has the right to regulate such sales if it so desires, the question is whether such right was exercised when the legislature defined a public utility as: "Any * * * corporation * * * owning or operating any facilities for * * * furnishing gas by piped distribution system * * * to the public for compensation". Section 490A.1(1).

In my opinion the key phrase is "to the public". The majority interprets the phrase to mean "sales to a sufficient of the public to clothe the operation with a public interest and does not mean willingness to sell to each and every one of the public without discrimination". This definition is not in accord with the commonly accepted meaning of public sales or public services and I do not believe the legislature intended to so define "to the public".

After stating the issue to be: "whether the legislature has exercised its admitted right to regulate" agreements between contracting parties, the majority fails to distinguish between cases in which the issue was the *right to regulate* and those in which the issue was the *legislative intent to regulate*. The cases upon which the majority rely for authority for their definition of "to the public" were not concerned with the meaning of such phrase or legislative intent. The issue in all instances was the right to regulate contractual sales under a definition of public utility clearly intended to include them.

The statute involved in Industrial Gas Co. v. Public Utilities Commission, 135 Ohio St. 408, 21 N.E.2d 166; 29 P.U.R.,N.S., 89, defined public utilities as corporations "engaged in the business of supplying natural gas for lighting, power or heating purposes *to consumers* within the state". "To consumers" is much broader than "to the public". Those with whom appellee privately contracted here were consumers and the rates would be subject to regulation if our statute read as the Ohio statute.

The question in Industrial Gas Co. was whether it was "in reality a public utility". The court held it was a public utility even though the public had no right to demand and receive services saying: "The question whether a business enterprise constitutes a public utility is determined by the nature of its operations. * * * A corporation that serves such a substantial part of the public as to make its rates, charges and methods of operations a matter of public concern, welfare and interest subjects itself to regulation by duly constituted governmental authority."

The case turns upon the *right* to regulate, which right is conceded here, not upon whether the legislature exercised the right.

In Natural Gas Service Co. v. Serv-Yu Cooperative, Inc., 70 Ariz. 235, 219 P.2d 324, it was decided Serv-Yu Corporation Inc. was "a public service corporation, subject to the jurisdiction and regulation of

the Corporation Commission". The Arizona Constitution provided:

"All corporations other than municipal engaged in * * * furnishing gas * * * for fuel light and power; * * * shall be deemed public service corporations."

"The present statute 69–201 ACA 1939, subjects public service corporations to regulation where the products are disposed of 'for sale' or 'for conpensation'." 219 P.2d at 329.

There is no question but what Arizona sought to regulate Serv-Yu. The question again was the *right* to regulate where sales were restricted to members. The case is authority for what may be classified as a public utility but it does not aid us in determining whether the Iowa legislature intended to regulate private contractual direct line gas sales.

The statute, Laws 1945, c. 53, § 1, involved in Public Service Commission v. Panhandle Eastern Pipeline Co., 224 Ind. 662, 71 N.E.2d 117, defined a gas utility as "any public utility selling or proposing to sell or furnish gas directly to any consumer or consumers within the State of Indiana for his, its or their domestic, commercial or industrial use". The court commented: "Certainly appellee is selling or proposing to sell gas directly to consumers in Indiana."

Appellee was within the definition of a public utility. The question was the *right* to regulate direct line sales to large industrial customers.

These cases are authority for the proposition that a corporation can be regulated as a public utility even though it does not hold itself out as serving the general public. They are not authority for the proposition that private contractual sales are sales to the public, for which they are cited by the majority.

It is one thing to say a corporation can be classified as a public utility without the public having the right to demand and

receive its services. It is a far different thing to say contractual sales to individual customers are sales "to the public". It may very well be the public has an interest in these contractual sales and they should be regulated. That is a matter of public policy for the legislature, not us, to decide. I believe the legislature excluded such sales by limiting the authority of the commission to the furnishing of gas "to the public".

Other sections of 490A support this construction of the statute. Section 490A.9 provides in part:

"2. Every public utility engaged directly or indirectly in any other business than that of the production, transmission or furnishing of heat * * * to the public shall," [keep separate accounts of such business] and "all profits and losses may be taken into consideration by the commission if deemed relevant to the general fiscal condition of the public utility."

Here the legislature recognized that corporations classified as public utilities may have some other business which is not subject to regulation. Eighty-five per cent of appellee's retail business is regulated by the commission and covered by the definition. The 15% in issue here would be "other business" which the commission could consider in computing the overall profit of the public utility.

Section 490A.21 states: "The jurisdiction and powers of the commission shall extend as hereinbefore provided to the *utility business* of the public utilities operating within this state to the full extent permitted by the constitution and laws of the United States."

This section shows the legislature intended to regulate only the utility business of the public utility, and recognized it could have other business which it did not intend to regulate.

Cases which have considered legislative intent from the use of phrases similar to "to the public" in defining a public utility support the conclusion herein reached.

Public Utilities Commission v. Colorado Interstate Gas Co. (1960), 142 Colo. 361, 351 P.2d 241, involved a statute similar to ours. There a public utility was defined in part as "a pipeline gas corporation operating for the purpose of *supplying the public*" with gas.

It determined direct sales by the pipeline company to its commercial and industrial users did not fall within the definition of public utility saying " * * * [I]t does say in no uncertain terms that one must be 'supplying the public'. It is well settled that those words mean *all* of the public within its capacities—it means indiscriminately." 351 P.2d at 248.

The Colorado court distinguished the cases cited by the majority. In referring to Industrial Gas Company v. Commission, supra, the court said: "The question before the court was not whether Industrial Gas Company came within the terms of the statute but whether the statute was valid. No one could or did contend that Industrial Gas Company was not a public utility as defined by the Ohio Statute."

In Drexelbrook Association v. Pennsylvania Public Utilities Commission, 418 Pa. 430, 212 A.2d 237, plaintiff proposed to furnish water to the tenants of its apartments by including charges for the water in the rent. Remetering at a profit was contemplated only for tenants of its stores and swimclub. The commission sought to regulate its rates under a statute similar to ours.

The court stated: "The question presented is whether the services which appellant proposes to furnish to its tenants would be service *to or for the public* within the meaning of the statute." The court cited cases which made the test of "a public" enterprise whether it was open to the use of all members of the public who may require it.

The court said: "[Here] * * * those to be serviced consist only of a special class of persons—those to be selected as

tenants—and not a class open to the indefinite public. Such persons clearly constitute a defined, privileged and limited group and the proposed service to them would be private in nature."

In referring to public policy argument as to why such sales should be regulated the court said:

"Such reasoning disregards the express formulation of public policy by the Legislature embodied in the statutory definition of the term 'public utility'. That provision confers jurisdiction on the commission *only* where the service involved is rendered 'to or for the public'. The controlling consideration is not whether regulation is desirable, but whether appellant is subject to regulation under the Public Utility Law. * * * If the legislature did not deem it necessary to confer jurisdiction on the commission with respect to the service proposed by appellant * * * then the absence of such jurisdiction as a result * * * could not contravene public policy." p. 243.

See also Mississippi River Fuel Corp. v. Illinois Commerce Commission, 1 Ill. 2d 509, 116 N.E.2d 394, 399.

In my opinion the legislature knew what it was doing when it used the phrase "to the public". It meant to the public. I do not believe it intended to include contractual sales to individual customers within the term. If this construction is wrong, the legislature can easily change the definition of a public utility to include such sales. It did not do so in 1967 although the commission proposed such a bill. It is less harmful to delay regulation of such sales until the legislature has clearly expressed the intention to subject them to regulation, than to make a policy decision by putting a strained construction on the phrase "to the public".

GARFIELD, C. J., and SNELL, J., join in this dissent.