STATE OF NORTH CAROLINA ex rel UTILITIES COMMISSION, TWO-WAY RADIO OF CAROLINA, INC. (PROTESTANT), AND TARHEEL ASSOCIATION OF RADIO-TELEPHONE SYSTEMS, INC. (INTERVENORS) v. WILLIAM D. SIMPSON, "RADIO COMMON CARRIER SERVICE"

No. 59

(Filed 29 August 1978)

1. **Utilities Commission § 3— "public" utility—factors considered**
     Whether any given enterprise is a public utility within the meaning of a regulatory scheme does not depend on some abstract, formulistic definition of "public" to be thereafter universally applied but depends on the regulatory circumstances of the particular case. Some of these circumstances are (1) nature of the industry sought to be regulated; (2) type of market served by the industry; (3) the kind of competition that naturally inheres in that market; and (4) effect of non-regulation or exemption from regulation of one or more persons engaged in the industry.

2. **Utilities Commission § 20— radio communications service for doctors—public utility**
     A medical doctor who provides a two-way radio service for ten doctors in his county medical society for compensation is operating a "public" utility within the meaning of G.S. 62-3(23) and G.S. 62-119(3) and is, therefore, subject to regulation by the Utilities Commission where the doctor serves over 45 percent of the available market in the county; the radio common carrier industry is a small one whose users fall into definable classes; and if prospective offerors of radio services are allowed to approach these separate classes without

regulation the industry could easily shift from a regulated one to a largely unregulated one with the burdensome, less profitable service left on the regulated portion.

Justice MOORE dissenting.

ON petition for discretionary review of a decision of the Court of Appeals in which the opinion of the court was rendered by *Arnold, J.,* and concurred in by *Brock, C.J.,* and *Parker, J.,* and which affirmed an order of the North Carolina Utilities Commission. The decision is reported at 32 N.C. App. 543, 232 S.E. 2d 871 (1977). The case was argued as No. 39 at the Fall Term 1977.

*Edward B. Hipp, Commission Attorney, and Theodore C. Brown, Jr., Assistant Commission Attorney, for plaintiff appellee.*

*Reynolds & Howard, by Ted R. Reynolds and E. Cader Howard, Attorneys for protestant appellees.*

*Hamrick, Mauney & Flowers, by Joe Mauney, Attorneys for defendant appellant.*

EXUM, Justice.

Dr. William D. Simpson, a physician engaged in the practice of medicine in Shelby, Cleveland County, filed application with the Utilities Commission on 21 February 1975 requesting a hearing to determine whether a two-way radio communication service he was operating in conjunction with a telephone answering service was a public utility. Two-Way Radio of Carolina, Inc., and Tarheel Association of Radio-Telephone Systems, Inc., were permitted to intervene. The Commission's hearing examiner treated the application as one for an exemption from regulation and recommended that it be denied. The Commission denied the application and the Court of Appeals affirmed. Largely for the reasons and authorities given in its opinion we affirm the decision of the Court of Appeals.

[2] The question presented is whether Dr. Simpson's two-way radio service, which he offers to members of his County Medical Society as an adjunct to a telephone answering service, is a public utility within the meaning of General Statutes 62-3(23) and 62-119 and therefore subject to regulation by the Utilities Commission. The answer is yes.

Dr. Simpson owns a telephone answering service in Shelby that has over 60 subscribers. As an adjunct to this service he

operates a mobile radio system. The base station for the system is an 80-watt, two-way radio and a 70-foot tower. The mobile units are seven portable two-way radios and three radio pagers or "beepers." When a subscriber to the radio system cannot be reached by telephone, an operator at the answering service will contact him and relay a message by radio. Dr. Simpson has a Federal Communications Commission license for this system that at present limits his operation to ten mobile units.

Subscribers to the radio system are Dr. Simpson and nine other Cleveland County physicians. Dr. Simpson testified that he was offering the service exclusively to members of the Cleveland County Medical Society, a group of some 55 to 60 persons. There was some evidence that in the past other persons had been allowed to use the system, but at the time of the application all subscribers were physicians. Subscribers to the radio service are charged fees in addition to any they might pay for the answering service although, according to Dr. Simpson, these fees are intended only to recapture his costs over a five-year period and not to generate a profit.

Two-Way Radio of Carolina, Inc., an intervenor and protestant in this action, operates a certificated radio common carrier service in several western North Carolina counties including Cleveland County. At the hearing the evidence was that it had 12 subscribers to its Cleveland County service, none of whom were physicians.

General Statute 62-30 gives the Utilities Commission the power "to supervise and control the public utilities of the State." The definition of "public utility" relevant here is found in General Statute 62-3(23)a.6:

> " 'Public utility' means a person . . . owning or operating in this State equipment or facilities for . . . 6. Conveying or transmitting messages or communications by telephone or telegraph, or any other means of transmission, where such service is *offered to the public* for compensation." (Emphasis supplied.)

The Commission also has general regulatory power over "radio common carriers" under General Statutes 62-119 through 62-124. A "radio common carrier" is defined as a person who is engaged in "owning, operating or managing a business of *providing or offering a service for hire to the public* of one-way or two-way radio

or radiotelephone communications . . . ." G.S. 62-119(3). (Emphasis supplied.)

No one disputes that Dr. Simpson is transmitting messages by way of radio communication for compensation. The question is whether he is offering this service to the "public." Giving meaning to this term, which is not defined in Chapter 62 of the General Statutes, is therefore necessary for appropriate resolution of the case. "The public does not mean everybody all the time." *Terminal Taxicab Co. v. District of Columbia,* 241 U.S. 252, 255 (1916). The problem here really is whether a medical society of 55 to 60 members is so much less than "everybody all the time" that it falls without the meaning of "public" as that term is used in the governing statutes. Dr. Simpson contends that it is and argues that in order for a service to be offered to the "public" it must be offered to an indefinite class or to the community at large. The Utilities Commission and the protestant contend, on the other hand, for a more flexible definition of "public" that focuses on the preservation of the legislatively mandated regulatory framework. On balance, the Utilities Commission and the protestant have the better legal position.

Only one prior North Carolina case has attempted to define "public" in the utilities context. *Utilities Comm. v. Telegraph Co.,* 267 N.C. 257, 148 S.E. 2d 100 (1966). In that case the applicant sought to set up a mobile radio telephone service for the Kinston area. He obtained a Federal Communications Commission construction permit that would allow his facility to serve 45 customers. A survey of the area indicated that he could actually expect 33 subscribers. Despite the small size of his planned operation and the fact that it was limited to one community, this Court held that it was a public utility, saying, *id.* at 268, 148 S.E. 2d at 109:

> "One offers service to the 'public' within the meaning of this statute when he holds himself out as willing to serve all who apply up to the capacity of his facilities. It is immaterial, in this connection, that his service is limited to a specified area and his facilities are limited in capacity. For example, the operator of a single vehicle within a single community may be a common carrier."

In *Telegraph Co.* the applicant did, in fact, offer his service to anyone who applied for it to the limit of its capacity. This Court held that to be an offering of the service to the "public." This

Court did not, however, foreclose consideration of whether a service offered only to a selected class of persons might also be considered an offering to the "public." *Telegraph Co.*, therefore, is merely the beginning and not the end of our inquiry.

Courts in several other jurisdictions have dealt with similar problems in interpreting their public utility statutes, and their decisions can provide us with some guidance. In *Terminal Taxicab Co. v. District of Columbia*, supra, 241 U.S. 252, the United States Supreme Court concluded that a taxicab company was a common carrier offering its services to the public even though the service was, by contract, limited to the patrons of several hotels and a railroad station. The Court said, *id.* at 255: "The [taxicab] service affects so considerable a fraction of the public that it is public . . . ." A similar test was applied and a similar result reached in *Surface Transportation Corp. v. Reservoir Bus Lines*, 271 App. Div. 556, 67 N.Y.S. 2d 135 (1946). There defendant offered bus service only to tenants of certain apartments pursuant to contracts it had entered into with their landlords. The applicable regulatory statute reached bus operations "for public use." The court found defendant to be serving the public, saying, *id.* at 560, 67 N.Y.S. 2d at 139: "Its service affects so considerable a fraction of the public [in the area that it served] that it is public in the same sense in which that term is applied to any other service." In *Iowa State Commerce Comm. v. Northern Natural Gas Co.*, 161 N.W. 2d 111 (Iowa 1968), defendant, a natural gas pipeline company, offered direct pipe line taps to selected retail customers, numbering 1740 domestic (most of whose land was crossed by the pipeline) and 93 commercial and industrial users. Defendant argued that it was not furnishing service to the "public" because it was not offering service to the public at large. The court disagreed, however, and concluded that the phrase "to the public" in the applicable regulatory statutes meant "sales to sufficient of the public to clothe the operation with a public interest and . . . not . . . willingness to sell to each and every one .of the public without discrimination." *Id.* at 115. In the foregoing cases offers of service were made to some subclassification of the general populace; nevertheless the offers were uniformly held to be made to the "public."

A seemingly different result was reached in *Drexelbrook Associates v. Pennsylvania Public Utility Comm.*, 418 Pa. 430, 212 A. 2d 237 (1965). The enterprise in question there was furnishing gas, water and electric service to tenants of a large apartment

complex it owned. It bought these services at a reduced rate from a utility company serving the area and resold them to its tenants at retail rates. The Pennsylvania Supreme Court held that the enterprise was not furnishing services "to or for the public," stating: "Here . . . those to be serviced consist only of a special class of persons — those to be selected as tenants — *and not a class opened to the indefinite public.* Such persons clearly constitute a defined, privileged and limited group and the proposed service to them would be private in nature." *Id.* at 436, 212 A. 2d at 240. (Emphasis supplied.)

[1]   We have no quarrel with the result in any of the cited cases. All seem correctly decided. Their teaching is that whether any given enterprise is a public utility within the meaning of a regulatory scheme does not depend on some abstract, formulistic definition of "public" to be thereafter universally applied. What is the "public" in any given case depends rather on the regulatory circumstances of that case. Some of these circumstances are (1) nature of the industry sought to be regulated; (2) type of market served by the industry; (3) the kind of competition that naturally inheres in that market; and (4) effect of non-regulation or exemption from regulation of one or more persons engaged in the industry. The meaning of "public" must in the final analysis be such as will, in the context of the regulatory circumstances, and as already noted by the Court of Appeals, accomplish "the legislature's purpose and comport with its public policy." 32 N.C. App. at 546, 232 S.E. 2d at 873.

This kind of ad hoc approach has been adopted by the Supreme Courts of Iowa and New Mexico. Both have refused to endorse inflexible definitions of "public," identifying instead as the standard "sales to sufficient of the public to clothe the operation with a public interest." *Griffith v. New Mexico Public Service Comm.,* 86 N.M. 113, 116, 520 P. 2d 269, 272 (1974); *Iowa State Commerce Comm. v. Northern Natural Gas Co., supra,* 161 N.W. 2d at 114. It is this type of flexible interpretation that is necessary to comport legislative purpose with the variable nature of modern technology.

Our legislature by enacting General Statutes 62-119 through 62-124 clearly intended to regulate radio common carriers which offered for hire services consisting of radio or radio-telephone communications to the public. The industry in North Carolina is a small one. The record indicates that there are only 3000 to 3500 subscribers to such a service in the entire state. The kind of per-

sons who use the service can also be identified with a fair degree of certainty. They are, in the main, doctors, realtors, and builders. Doctors are especially prominent users of the service. One operator testifying before the hearing examiner indicated that 24 percent of his subscribers were medical personnel; another, that 68 of the 80 users of her paging service were doctors. The experience of protestant, Two-Way Radio, is further illustrative. In Cleveland County where it operates in competition with Dr. Simpson, none of its 12 subscribers are doctors. In Mecklenburg County, by comparison, 113 of its 450 subscribers are doctors.

The radio common carrier industry is therefore a small one whose users fall into definable classes. Were a definition of "public" adopted that allowed prospective offerors of services to approach these separate classes without falling under the statute, the industry could easily shift from a regulated to a largely unregulated one. A service could be operated for doctors or realtors or builders, escape regulation and still capture a substantial portion or even a majority of the market. For example, while Dr. Simpson is offering the service to only ten subscribers, the record indicates there are only 22 radio common carrier subscribers in the whole of Cleveland County. Dr. Simpson is therefore serving over 45 percent of the available market. The end result of the kind of exemption Dr. Simpson argues for could well be that the only subscribers left in the regulated market would be those who fit in no easily definable class. Even if this extreme situation were not reached, unregulated radio services might focus on classes which are easier and more profitable to serve. The result would be to leave burdensome, less profitable service on the regulated portion resulting inevitably in higher prices for the service.

[2] We hold, therefore, that in the regulatory circumstances of this case Dr. Simpson is offering a service to the public within the meaning of General Statutes 62-3(23) and 62-119. Consequently he is subject to regulation by the Utilities Commission. The decision of the Court of Appeals is

Affirmed.

Justice MOORE dissenting.

I do not believe that Dr. Simpson was operating a public utility. I therefore respectfully dissent.

In this day and age of increasing government regulation by both federal and state agencies, rather than expand definitions to bring more activities under regulation I believe we should seek to restrict regulation to those activities clearly requiring it.

The majority opinion cites several cases holding that one who offers services to a limited subclass of the general populace can still be serving the "public." Two of these cases, *Terminal Taxicab Co. v. District of Columbia*, 241 U.S. 252, and *Surface Transportation Corp. v. Reservoir Bus Lines*, 271 App. Div. 556, are distinguishable from present case in that they involve the supplying of transportation services to a large and varying subclass of individuals, none of whom directly contracted with the transportation services involved. In present case "so considerable a fraction of the public . . ." is not directly affected by the service offered, but rather only those few physicians who contracted for the service. The third case cited by the majority in its favor, *Iowa State Commerce Comm. v. Northern Natural Gas Co.*, 161 N.W. 2d 111, involved the supplying of natural gas pipeline taps to over 1800 retail customers, a "considerable fraction" of the public by anyone's determination. Furthermore, all three cases involve the supplying of those sorts of services (transportation and fuel) which are of a more substantial public interest in that they involve a much greater immediate effect on the general populace as a whole than does the supplying of telephone paging services.

I do not think Dr. Simpson intended to or was in fact operating a public utility. To the contrary, he was offering at cost a private service to his colleagues in the medical profession only, and not to the public at large.

G.S. 62-3(23)a.6 provides:

" 'Public utility' means a person . . . owning or operating in this State equipment or facilities for: . . . 6. Conveying or transmitting messages or communications by telephone or telegraph, or any other means of transmission, where such service is *offered to the public* for compensation." (Emphasis added.)

In interpreting this statute in *Utilities Commission v. Telegraph Co.*, 267 N.C. 257, 148 S.E. 2d 100 (1966), we said: "One offers service to the 'public' within the meaning of this statute when he holds himself out as willing to serve all who apply up to the capacity of his facilities." Dr. Simpson only offered to serve his fellow doctors — not all those who applied.

In my opinion, the rule adopted by the Supreme Court of Pennsylvania, as quoted in the majority opinion, is preferable to a more inclusive one. That court, in holding that the enterprise in question was not furnishing service "to or for the public," stated: "Here . . . those to be serviced consist only of a special class of persons—those to be selected as tenants—and not a class opened to the indefinite public. Such persons clearly constitute a defined, privileged and limited group and the proposed service to them would be private in nature."

I see no real danger, as the majority apparently does, that other such small identifiable groups could organize so as to be unregulated rather than regulated. In the event such development does occur and is found to be undesirable, it can always be corrected by the General Assembly.

The wording of the statute which defines a public utility is plain, that is, ". . . where such service is offered to the public . . . ." I do not believe the service offered by Dr. Simpson falls within the scope of that definition.

I vote to reverse.

Justice LAKE and COPELAND join in this dissent.