**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 26 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JUSTIN HILL; GARY A. MARTIN;
MARY ANN MARTIN; JIM A
MOWDER; ALLAN FLENTIE;
ROBERT A. CROWN; DAVID
STUTENROTH; WILLIAM D.
HAMILTON; LAWRENCE PAPER
COMPANY, INC.,

     Plaintiffs - Appellants,

        and

MARY ALICE STANDIDGE; W.S.
DICKEY CLAY MANUFACTURING
COMPANY, on behalf of themselves
and other retail natural gas customers
similarly situated,

     Plaintiffs,

vs.

KANSAS GAS SERVICE
COMPANY; GREELEY GAS
COMPANY; UTILICORP UNITED,
INC.,

     Defendants - Appellees.

-------------------------

KANSAS CORPORATION
COMMISSION,

No. 02-3096

Amicus Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 01-CV-2315-CM)**

---

Stuart W. Conrad (and C. Edward Peterson, with him on the briefs), Finnegan, Conrad & Peterson, L.C., Kansas City, Missouri, for Plaintiffs - Appellants.

Karl Zobrist (and Brian D. Martin, with him on the brief), Blackwell, Sanders, Peper, Martin, L.L.P., Kansas City, Missouri, for Defendants - Appellees UtiliCorp. United Inc. and Greeley Gas Company.

John P. DeCoursey, Kansas Gas Service Company, Shawnee Mission, Kansas for Defendant - Appellee Kansas Gas Service Company.

John J. McNish, Advisory Counsel, Kansas Corporation Commission, Topeka, Kansas, Amicus Curiae.

---

Before **SEYMOUR**, **PORFILIO**, and **KELLY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

Plaintiffs-Appellants, various individual and business retail natural gas customers in the state of Kansas ("Plaintiffs"), appeal the dismissal of their class action complaint for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12 (b)(1). The three named defendants: Kansas Gas Service Company ("KGS"), Greeley Gas Company ("Greeley"), and Utilicorp United, Inc., ("Utilicorp")

- 2 -

(collectively, "Defendants"), are local natural gas public utilities[1] operating within the state of Kansas. Plaintiffs' complaint asserted claims arising under the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301- 3432 ("NGPA") and 42 U.S.C. § 1983 based on alleged deprivations of their property without due process or just compensation. The complaint sought, *inter alia*, a declaratory judgment that Plaintiffs have a property interest in certain refunds that Defendants have received from various interstate natural gas pipelines and that the refunds should therefore be distributed to Plaintiffs and other similarly situated retail natural gas customers. The district court dismissed the action on the ground that it lacked subject-matter jurisdiction under 28 U.S.C. § 1342 ("the Johnson Act" or "§ 1342") and this appeal followed. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

Plaintiffs allege that they were retail natural gas customers of Defendants or their predecessors in interest between 1983 and 1988. During this time the NGPA set statutory price ceilings for sales of natural gas by natural gas producers

---

[1] The Natural Gas Policy Act of 1978 refers to a natural gas public utility engaged in the distribution or sale of natural gas for "ultimate consumption" as a "local distribution company." 15 U.S.C. § 3301 (17). This opinion will therefore refer to these entities as "LDCs" when not specifically referring to the defendants named in this action.

to interstate natural gas pipelines.[2]  Despite these price ceilings, the NGPA authorized producers to sell gas for amounts exceeding the price limits in order to recover the cost of any state "severance, production, or similar tax, fee, or other levy imposed on the production of natural gas."  15 U.S.C. § 3320 (repealed effective 1993); Aplee. Supp. App. at 30-31.  Because, in 1974, the Federal Power Commission, the predecessor to the Federal Energy Regulatory Commission ("FERC"), qualified Kansas ad valorem taxes as a recoverable production tax, producers of natural gas from that time forward charged them to their interstate pipeline customers.  The interstate pipelines, in turn, added those amounts to the price of natural gas charged to LDCs (including the defendants in this action), which in turn passed the costs through to their retail customers via Purchased Gas Adjustment clauses or Cost of Gas Riders (collectively, "PGA clauses") in their filed rate tariffs.[3]

In 1983, more than a decade after natural gas producers first started charging interstate pipelines to recover the cost of Kansas ad valorem taxes, a

---

[2]  In 1989 Congress repealed the sections of the NGPA providing natural gas price controls, 15 U.S.C. § 3311-3320.  See Pub. L. 101-60, § 2(b), July 26, 1989, 103 Stat. 158, effective January 1, 1993.

[3]  In describing the PGA clauses at issue here, the Court of Appeals of Kansas has stated that the clauses permit LDCs to "pass on their natural gas commodity cost (selling price from pipeline to LDC) to their customers.  Based on the clauses, Kansas ad valorem taxes were passed on to retail customers."  Farmland Indus., Inc. v. Kansas Corp. Comm'n, 37 P.3d 640, 643 (Kan. Ct. App. 2002).

- 4 -

complaint was filed before the FERC challenging the legality of the charges on the ground that the taxes did not constitute a "production, severance or similar tax," and that the rates charged therefore violated the NGPA to the extent that they exceeded the Act's prescribed price ceilings. Sun Exploration & Prod. Co., 36 F.E.R.C. ¶61,093 at 61,223 (1986). After initially upholding the legality of the charges, and after several years of litigation including multiple appeals to the United States Court of Appeals for the District of Columbia Circuit, the FERC concluded that the taxes at issue should be treated as property taxes rather than severance taxes, and that the prices charged therefore violated the NGPA. Colorado Interstate Gas Co., 65 F.E.R.C. ¶61,292 at 62,367 (1993). Consequently, the FERC ordered the natural gas producers to refund the overcharge amounts to their interstate pipeline customers, and the interstate pipelines to pass through the refunds to the affected LDCs. Id. at 62,374. The District of Columbia Circuit affirmed the FERC's holding and ordered the producers to refund the taxes included in the rates charged to interstate pipelines between 1983 and 1988. Public Serv. Co. of Colorado v. FERC, 91 F.3d 1478, 1492 (D.C. Cir. 1996).

Subsequent to the FERC's orders, the Kansas Corporation Commission ("KCC")–which under Kansas law is charged with regulating the rates and charges of natural gas LDCs, see Kan. Stat. Ann. §§ 66-1,200 to 1,210–opened a

docket to determine how the refunds should be distributed by the LDCs to their numerous retail customers. In 1999, the KCC approved each Defendant's refund distribution plan. Each plan proposed to allocate a portion of the refunded amounts to a low-income energy assistance program with the remainder to be refunded to specified categories of retail customers.

On January 2, 2001, the KCC issued an order directing KGS to release a portion of the refund amounts in its possession for use in its approved low-income assistance program, with the remainder to be immediately distributed to current sales customers through its PGA clause. By the end of January, however, it had become apparent that many residential natural gas customers would face significant hardships due to the combination of lower-than-normal winter temperatures and substantially higher natural gas prices.[4] Based in part on these "changed circumstances," the KCC issued an order on February 19, 2001 granting reconsideration of the January 2nd order and setting a hearing to further discuss distribution of the refunds. Aplee. Supp. App. at 88-89.

Following a series of hearings, orders, and petitions for reconsideration by various concerned parties, the KCC issued an order on May 3, 2001 (the "May 3

---

[4] In fact, on January 31, 2001, both houses of the Kansas Legislature passed unanimous resolutions urging the KCC to allocate *all* ad valorem tax refunds held by Kansas LDCs to low-income energy assistance for qualified individuals and families not already receiving low-income energy assistance program (LIEAP) benefits. See Aplee. Supp. App. at 147-48.

Order") substantially modifying the manner in which the refunds were to be distributed. The KCC found that residential gas users as a class were impacted more severely than other classes of users by the combination of colder temperatures and higher gas costs. Accordingly, the KCC ordered the refund amounts possessed or soon to be possessed by Defendants–which by this time totaled over 30 million dollars–to be distributed to qualified residential natural gas customers in Defendants' respective service areas with a family income at or below 300 percent of the federal poverty level. Aplee. Supp. App. at 114-15. The KCC stated that the maximum amount of any individual refund would be the difference between the customer's 1999-2000 and 2000-2001 heating season natural gas bills and that each eligible customer should receive his or her refund via a bill credit to the customer's account in that amount. The KCC further ordered Defendants to submit separate low-income distribution plans tailored to the needs of their individual customers within the limits set forth in the May 3 Order.

Following submission of Defendants' plans, several intervenors, including the Midwest Gas Users Association ("MGUA"), an unincorporated association of large natural gas customers whose members included some of the industrial plaintiffs named in this action, filed petitions for reconsideration of the May 3 Order. Before the KCC ruled on the intervenors' petitions, MGUA filed a civil

action in Kansas district court which unsuccessfully sought a temporary restraining order enjoining implementation of the KCC's orders. On June 25, 2001, Plaintiffs filed the instant action through the same attorneys that represented MGUA. The KCC denied the interveners' petitions for reconsideration on June 29, 2001 and on July 6 approved with some modifications Defendants' previously submitted distribution plans.

Plaintiffs' complaint in the present action sought: (1) a declaratory judgment that they have a property interest in the refunds Defendants have received and that the refund amounts should therefore be distributed to them and other similarly situated retail customers, (2) the placement of all refund amounts in a constructive trust pending resolution of Plaintiffs' claims, and (3) an order directing the refunds to be distributed to Plaintiffs and other retail customers by virtue of their status as third party beneficiaries of the transactions giving rise to the refunds. Aplt. App. at 26-30. Defendants moved to dismiss on the ground that the district court lacked jurisdiction under 28 U.S.C. § 1342, which precludes federal courts from retaining jurisdiction over any suit seeking to enjoin, suspend or otherwise restrain the operation of "any order affecting rates chargeable by a public utility and made by a State administrative agency," where four additional requirements are satisfied. The district court granted Defendants' motion and dismissed the action, holding that the KCC orders at issue were "order[s]

affecting rates," and that each of the conditions enumerated in § 1342 were satisfied. This appeal followed.

## Discussion

Originally enacted in 1934, the Johnson Act, 28 U.S.C. § 1342, provides that:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
>
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
>
> (2) The order does not interfere with interstate commerce; and,
>
> (3) The order has been made after reasonable notice and hearing; and,
>
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

Plaintiffs argue that the district court erred in dismissing their claims under § 1342 because (1) the KCC orders at issue do not affect rates; (2) the Johnson Act's fourth requirement is not met because there is "no state remedy in Kansas for addressing the wrongs [of which Plaintiffs complain]," Aplt. Br. at 29; and (3) to the extent Plaintiffs have asserted a property right claim arising from a state utility matter, such is "well within the subject-matter jurisdiction grant of 28

U.S.C. § 1331" under the Supreme Court's recent opinion in <u>Verizon Maryland, Inc. v. Public Serv. Comm'n of Maryland</u>, 535 U.S. 635, 122 S.Ct. 1753 (2002). Aplt. Br. at 18.[5]

We review de novo a dismissal for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12 (b)(1). <u>Tippetts v. United States</u>, 308 F.3d 1091, 1093-94 (10th Cir. 2002); <u>U.S. West Inc., v. Tristani</u>, 182 F.3d 1202, 1206 (10th Cir. 1999) (reviewing de novo the district court's dismissal for lack of subject-matter jurisdiction under the Johnson Act). "The burden of showing that the [Johnson Act's] conditions are present is on the party invoking the act." <u>Tristani</u>, 182 F.3d at 1207.

In delineating the scope of § 1342, we have observed that "[t]he evil sought to be remedied by the Johnson Act was the federal courts' interference with the states' own control of their public utility rates." <u>Tennyson v. Gas Serv. Co.</u>, 506 F.2d 1135, 1137 (10th Cir. 1974). In <u>Tennyson</u>, we further noted that "by its broad wording it is clear that [the Johnson Act] was intended to keep constitutional challenges to orders affecting rates out of the federal courts 'lock, stock and barrel,' or, as Professor Moore succinctly puts it, to effect a 'general

---

[5] Plaintiffs also advance various arguments bearing on the merits of their claims, such as whether they had a property interest in the refunded amounts and whether they were deprived of their property under color of state law. <u>See</u> Aplt. Br. at 11, 12. Because we conclude that the district court correctly held that it lacked jurisdiction over Plaintiffs' action, we need not address these arguments.

hands-off policy relative to state rate making.'" Id. at 1138. Of course, the plain language of § 1342 also demonstrates that Congress did not intend to insulate from federal court review every matter involving a state administrative agency with regulatory authority over a public utility. As a threshold matter, a federal court will not be deprived of jurisdiction under § 1342 unless a plaintiff's challenge is to an "order affecting rates," and then only if each of the four conditions enumerated in the statute is satisfied. Tristani, 182 F.3d at 1207.

1. Order Affecting Rates

In the present action the district court concluded that the KCC orders were orders "affecting rates" because the KCC itself so characterized the orders and because the rates that qualified low-income natural gas customers would pay for gas would necessarily be less as a result of the orders. Aplt. App. at 310. Plaintiffs strenuously contend, however, that the orders did not affect rates because:

> there was no change made or sought to tariffs and there was no increase or decrease ordered or sought in the rates that the defendants charge their customers. . . . There was merely a mechanism established outside the rates and tariffs to credit [] select low income customers' bills . . . . The rates for utility service were not modified at all.

Aplt. Br. at 26.

It may be the case, as Plaintiffs argue, that the challenged orders did not specifically call for a rate increase or decrease, and "[n]ot one rate in the LDC's

tariff books will change." Aplt. Br. at 23. However, § 1342 does not require that an order result in a direct rate or tariff modification before it will operate to deprive a federal court of subject-matter jurisdiction. On the contrary, the proscriptive language contained in § 1342 clearly requires only that the challenged order or orders *affect* rates. It makes no difference that the aspect of the orders of which Plaintiffs complain (i.e., distribution of refunds in the form of a bill credit) do not themselves *directly* involve a "rate" charged by an LDC or listed in its filed tariff. As we noted in Tennyson, "the Johnson Act proscribes federal interference not with a 'rate' simpliciter but with 'any order affecting rates.'" 506 F.2d at 1140; see also National Teleinformation Network, Inc., v. Michigan Public Serv. Comm'n, 687 F. Supp. 330, 334 (W. D. Mich. 1988) (holding that because the phrase "order affecting rates" does not contemplate the breakdown of a rate affecting order into constituent rate and non-rate elements, § 1342's prohibition on federal interference with such orders should not be "selectively applied to only the elements of an order that affect rates."). After thoroughly reviewing the KCC's orders and the entire record on appeal, we conclude for the reasons that follow that the KCC's orders qualify as orders "affecting rates" under § 1342.

Consideration of how the refunds would have been distributed in the absence of the challenged orders makes it clear that the KCC's orders affected rates for purposes of § 1342. In addition to permitting Defendants to pass the cost

of gas through to retail customers, Defendants' respective PGA clauses each provided that any supplier refunds received must be distributed to Defendants' current sales customers. Aplee Supp. App. at 123. Furthermore, each clause provided that the KCC could, "on a case-by-case basis," exercise its discretion to alter the manner in which any supplier refunds are distributed. Aplee. Supp. App. at 98-99. Describing how a refund distribution under the unmodified terms of the PGA clauses would operate, the KCC stated in its May 3 Order that the clauses:

> each provide[] a specific treatment of refunds which would require the refund to be reflected as a reduction in the cost of gas during a period of time which generally would be 12 months. For instance, in KGS's tariff a "Supplier Refund factor" is calculated and the Company "shall include the Supplier Refund factor as a negative adjustment to the cost of gas purchased by the Company to meet sales service requirements.["] All other tariffs examined reach the same result with slightly different language.

Aplee. Supp. App. at 98. However, instead of leaving Defendants' tariffs to "operate on their primary terms which would have spread the refunds to all current sales customers," Aplee. Supp. App. at 126, the KCC exercised its authority to modify the default distribution scheme so as to channel the refund amounts to qualified low-income retail customers. Had the KCC not elected to alter the manner in which the refunds would be distributed under the PGA clauses, Defendants' cost of gas would have decreased due to the refund-based negative adjustment, which would have translated into a decrease in the per unit

price of gas paid by Defendants' retail customers.[6]  Consequently, the KCC orders which modified the default scheme were clearly orders "affecting rates" under § 1342.

Furthermore, the KCC's orders affected rates because the May 3 Order specifically provided that all refund amounts not needed to meet low-income assistance program requirements must be passed through to existing sales customers pursuant to the procedures set forth under Defendants' existing PGA clauses.  See Aplee. Supp. App. at 113, 115.  As noted above, such a refund would operate by decreasing the LDC's cost of gas, which in turn would decrease the price of gas purchased by retail customers.  Just as the May 3 Order affected rates because it modified the operation of a refund distribution scheme that would have resulted in a reduction of the price of natural gas paid by current sales customers, it also affected rates because it ordered compliance with that default

---

[6]  The record contains an example of how refunds are distributed to retail customers under Defendants' PGA clauses and Cost of Gas Riders.  As noted above, the KCC on January 2, 2001 approved KGS's plan to utilize a portion of the ad valorem tax refunds in its possession for low-income assistance, and ordered KGS to "immediately distribute the remaining $5.644 million . . . to existing general sales customers via its COGR."  Aplee. Supp. App. at 52. Significantly, a bill insert designed to explain to customers how the $5.644 million refund would be distributed under KGS's COGR stated that each customer's bill contained a "credit" derived from the ad valorem tax refunds it had received.  However, rather than providing a lump-sum credit to each customer's bill, the insert explained that the credit would be "provided through a reduction in the cost of gas" of approximately "45 cents per Mcf [one thousand cubic feet] on your current bill."  Aplt. App. at 218.

scheme upon the happening of a triggering event. Accordingly, we hold that the challenged orders constituted orders "affecting rates" under § 1342.

2. The Four Johnson Act Conditions

Our conclusion that the KCC's orders affected rates does not end our inquiry into whether the district court properly determined that it lacked jurisdiction over Plaintiffs' case. As noted above, § 1342 deprives a district court of jurisdiction over a suit challenging "any order affecting rates" only where the section's four additional requirements are met. On appeal, Plaintiffs do not challenge the district court's conclusion that the KCC's orders did not interfere with interstate commerce, 28 U.S.C. § 1342(2), and that the orders were issued after reasonable notice and hearings. 28 U.S.C. § 1342(3). See Aplt. App. at 315-316. Rather, Plaintiffs contend that even if the KCC orders at issue affected rates, § 1342 is nonetheless inapplicable because (1) jurisdiction was not based solely on diversity of citizenship or a constitutional violation, and (2) Plaintiffs have asserted a federal issue for which no adequate state remedy exists.

As to Plaintiffs' inadequate state remedy argument, we note that Plaintiffs failed to raise this argument before the district court. In their memorandum in opposition to Defendants' motion to dismiss, Plaintiffs argued only that the Johnson Act was inapplicable because the orders at issue did not affect rates, jurisdiction was not based solely on diversity or repugnance of the orders to the

Constitution, and the order was issued without adequate notice. Aplt. App. 206, 211, 214. We have repeatedly held that absent "extraordinary circumstances," we do not consider arguments raised for the first time on appeal. McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 999 (10th Cir. 2002). Finding no reason to depart from this rule here, we decline to address this argument.[7]

Furthermore, we disagree with Plaintiffs' contention that the first condition under § 1342 is not satisfied because their claims do not "rely solely on diversity jurisdiction or the repugnance of the orders to the Constitution." Aplt. Repl. Br. at 8. Plaintiffs argue that the Supreme Court's recent opinion in Verizon demonstrates that where a plaintiff claims that a state regulatory agency has issued an order that allegedly conflicts with a federal statute or other source of federal law other than the Constitution, "separate federal jurisdiction exists under [28 U.S.C.] § 1331." Id. Plaintiffs argue that to the extent they have alleged that the KCC's order channeling refunds into a low-income assistance program

_____

[7] We reach this conclusion despite the general rule that a party will not be deemed to have waived an argument challenging the existence of subject-matter jurisdiction by failing to raise the issue before the district court. See Insurance Corp. of Ireland v. Compagnie Des Bauxites De Guinee, 456 U.S. 694, 702 (1982). Plaintiffs do not here argue that jurisdiction is absent, but rather that jurisdiction exists. Obviously, the concern which justifies the rule exempting such challenges from analysis under the waiver doctrine–that a federal court not decide cases over which it has no jurisdiction under Article III of the Constitution–is lacking where a waiver would not increase the risk of a court proceeding without jurisdiction. We believe that application of the waiver doctrine is therefore appropriate.

conflicts with federal law, as interpreted by FERC and the D.C. Circuit, <u>Verizon</u> demonstrates that such allegations are "sufficient to establish a basis for jurisdiction . . . regardless of the ultimate viability of Plaintiffs['] claims." Aplt. Repl. Br. at 9. We disagree.

In <u>Verizon</u>, the Supreme Court held that where Verizon had alleged that an order issued by the Maryland Public Service Commission requiring it to pay certain amounts to a competing telephone service provider violated a provision of the Telecommunications Act of 1996 ("the Act"), such "presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." 122 S.Ct. at 1758-59. In so doing, the Supreme Court reversed the Fourth Circuit's holding that there was no federal question jurisdiction under § 1331 because 47 U.S.C. § 252 did not confer jurisdiction over the type of dispute presented in the case. See <u>Bell Atl. Md., Inc. v. MCI Worldcom, Inc.</u>, 240 F.3d 279, 308-309 (2001). The Court noted that the Fourth Circuit erred because "even if § 252(e)(6) does not *confer* jurisdiction, it at least does not *divest* the district courts of their authority under 28 U.S.C. § 1331 to review the Commission's order for compliance with federal law." <u>Verizon</u>, 122 S.Ct. at 1758 (emphasis in original). Although the Court in <u>Verizon</u> certainly held that jurisdiction over Verizon's claims existed under § 1331, we do not think that conclusion applies here.

- 17 -

First, we note that from our review of Plaintiffs' briefs and the record on appeal, it appears clear that Plaintiffs rely on the aforementioned federal statutes not in an attempt to establish a violation of those statutes per se, but rather to establish the existence of a property interest in the disputed refunds that would trigger the constitutional guarantees they claim were violated. For example, in their briefs to this Court, Plaintiffs characterize their claims as "claim[s] of property deprivation and violation of constitutional rights." Aplt. Br. at 18. Similarly, Plaintiffs argue that various federal decisions establish that they have a "property interest" in the disputed refunds, Aplt. Br. at 12, and that the refunds were "[t]aken from [t]hem [u]nder [c]olor of [l]aw." Aplt. Br. at 15. Likewise, Plaintiffs' primary contention before the district court was that the KCC's orders and Defendants' conduct "deprive[d] Plaintiffs of their property without due process and without just compensation in violation of 42 U.S.C. § 1983." Aplt. App. at 26.

However, neither § 1983, nor any other federal statute cited by Plaintiffs, is the source of the substantive rights which Plaintiffs claim were violated. The right to be free from deprivations of property without due process or just compensation derive, of course, from the protections contained in the Fourteenth and Fifth Amendments of the federal Constitution. Moreover, a claim brought under those constitutional provisions does not lose its character as a *constitutional*

claim merely because it relies on a federal statute to establish the existence of a property interest. A claim seeking damages for a violation of some constitutional right, while no less important than a claim seeking damages for the violation of a federal statute, is nonetheless precisely the type of claim that Congress intended to withdraw from the federal courts' jurisdiction under the Johnson Act.[8]

Moreover, even if Plaintiffs' citations to the aforementioned federal statutes could be viewed as an attempt to demonstrate that the statutes themselves have been violated, rather than merely an attempt to establish the existence of a property interest, we would nonetheless conclude that Verizon does not establish the existence of jurisdiction in this case. First, we note that Verizon did not involve a challenge to the subject-matter jurisdiction of the federal courts under the Johnson Act. The relevant jurisdictional issue in that case was simply whether the Fourth Circuit correctly determined that 28 U.S.C. § 1331 did not provide subject-matter jurisdiction because the exercise of federal question jurisdiction under § 1331 would have been contrary to the limited grant of

---

[8] To the extent that Plaintiffs attempt to argue that their claims are not premised entirely on the alleged unconstitutionality of the relevant orders because Defendants have violated § 1983, we find such an argument unpersuasive. Reliance on § 1983 to avoid application of the Johnson Act has been uniformly rejected by courts considering the question. See, e.g., Tennyson, 506 F.2d at 1139 (dismissing § 1983 action under the Johnson Act); Peoples Nat'l Util. Co. v. City of Houston, 837 F.2d 1366, 1368 (5th Cir. 1988) (holding that plaintiff cannot use § 1983 as an "end run" around the Johnson Act).

jurisdiction conferred in the Telecommunications Act itself. However, even if the Supreme Court in <u>Verizon</u> had specifically determined that the Johnson Act did not preclude the court's exercise of jurisdiction, <u>Verizon</u> would nonetheless be distinguishable from the case at bar.

In <u>Verizon</u>, the Court held that because "Verizon's claim turns on whether the Act, or an FCC ruling issued thereunder, precludes the Commission from ordering payment," the claim "thus falls within 28 U.S.C. § 1331's general grant of jurisdiction." 122 S.Ct. at 1759. Contrary to Plaintiffs' suggestion, however, that statement does not provide that jurisdiction will always be proper under § 1331 whenever a plaintiff alleges that a defendant's conduct conflicted with or violated a federal statute. As the Court noted in <u>Verizon</u>, such an allegation will be sufficient to confer federal question jurisdiction "unless the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or *where such a claim is wholly insubstantial and frivolous*." 122 S.Ct. at 1759 (quoting <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 89 (1998) (quotations omitted) (emphasis added). Significantly, the Court in <u>Verizon</u> specifically stated that Verizon's claim was within § 1331's grant of jurisdiction because "there is no suggestion that Verizon's claim is 'immaterial' or 'wholly insubstantial and frivolous.'" <u>Id.</u> We cannot say the same about Plaintiffs' claims in the present action.

Unlike the claim in Verizon, Plaintiffs' attempts to tie the KCC's orders to a violation of a federal statute or ruling of a federal court or agency are completely without merit. First, Plaintiffs cannot establish that Defendants' conduct or the KCC's orders violated either the Natural Gas Act, 15 U.S.C. §§ 717-717z ("NGA"), or the NGPA. By its terms, the NGA applies only to the "transportation of natural gas in interstate commerce, [or] to the sale in interstate commerce of natural gas for resale." 15 U.S.C. § 717(b). Because Defendants here did not engage in the sale of natural gas "for resale," the KCC's orders or Defendants' distribution of refunds could not have possibly contravened any provision of the NGA. See Columbia Gas Transmission Corp., 31 F.E.R.C. ¶61,307 at 61,681 n. 38 (1985) (holding that charges and refunds by LDCs are within the authority of state and local regulatory agencies under the NGA). Moreover, it is clear that the KCC's orders could not have violated the NGPA because the NGPA provisions that gave rise to the current action–those setting forth price ceilings for natural gas and permitting overcharges to recover the cost of state severance taxes–applied only to "first sale[s]" of natural gas. See 15 U.S.C. §§ 3312-3320 (1989) (repealed effective 1993.). Under the NGPA, a "first sale" is defined to exclude a sale of natural gas by an interstate pipeline or LDC unless such a sale is "attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any

affiliate thereof." 15 U.S.C. § 3301(21)(B). Because none of the LDCs named as defendants in this case produced the natural gas it sold, the district court correctly concluded that the NGPA does not apply to those transactions.

Furthermore, the fact that the refunds to which Plaintiffs' claim an entitlement arose from gas charges that were later found to violate the NGPA does not establish that the KCC's orders distributing the refunds to one class of retail customers likewise violated federal law. While prior FERC and federal court of appeals opinions did establish that the overcharges violated the NGPA, those opinions did not–as the district court's order granting Defendants' motion to dismiss made abundantly clear–order the LDCs to distribute the refunds to any retail customers, much less bestow upon Plaintiffs a property interest in the refunds. Aplt. App. at 313-15. Indeed, neither the FERC nor a federal court exercising jurisdiction under the NGA or the NGPA could have ordered such a refund, for as the FERC has repeatedly held, "distribution of refunds by an LDC is a matter within the purview of state and local regulatory authorities." Williams Gas Pipelines Central, Inc., 95 F.E.R.C. ¶61,055 at 61,138 (2001) (denying gas users' request to direct refunds to be paid to certain retail gas customers); see also Williams Gas Pipelines Central, Inc., 95 F.E.R.C. ¶61,3666 at 62,384 (2001) (holding that FERC "lack[s] jurisdiction over the rates charged by local distribution customers," because "[c]harges and refunds by local distribution

companies are within the purview of state and local regulatory authorities.").

Plaintiffs' arguments that District of Columbia Circuit opinions require the refunds to be distributed to "customers," Public Serv. Co. of Colorado, 91 F.3d at 1492, or "overcharged consumers," Anadarko Petroleum Corp. v. FERC, 196 F.3d 1264, 1269 (D.C. Cir. 1999), are similarly unavailing. Even if we were bound by opinions handed down in other circuits, which we are not, we would agree with the district court that the references to "customers" or "consumers," when read in context, establish that "the 'customers' to whom 'producers' were required to make refunds were 'their customers,' (i.e., interstate pipelines), and not the plaintiffs in this case." Aplt. App. at 314. Indeed, we fail to see how the district court could have reached a contrary conclusion in light of the aforementioned jurisdictional limitations imposed upon the FERC and federal courts adjudicating claims under federal natural gas statutes. For these reasons, we hold that Plaintiffs' allegations that the KCC's orders and Defendants' conduct conflicted with or violated a federal statute or ruling issued thereunder are "wholly insubstantial and frivolous." Verizon, 122 S.Ct. at 1759; Steel Co., 523 U.S. at 89. Accordingly, we hold that Plaintiffs' claims were "based solely on diversity of citizenship or repugnance of the order to the Federal Constitution," 28 U.S.C. § 1342(1), and reject Plaintiffs' argument that Verizon requires us to conclude otherwise.

In light of our rejection of Plaintiffs' argument that the first condition of the Johnson Act is not satisfied in this case, as well as our holding that the challenged KCC orders were orders "affecting rates," we conclude that the district court did not err in dismissing Plaintiffs' action for lack of subject-matter jurisdiction under 28 U.S.C. § 1342.

AFFIRMED.