**NORTHERN NATURAL GAS COMPANY, Appellant,**

v.

**IOWA UTILITIES BOARD, a Division of the Iowa Department of Commerce, Appellee.**

**Office of Consumer Advocate, a Division of the Iowa Department of Justice, Aquila, Inc., d/b/a Aquila Networks, Inc., f/k/a UtiliCorp United, Inc., d/b/a Peoples Natural Gas, a Delaware Corporation, Intervenors–Appellees.**

No. 03–0056.

Supreme Court of Iowa.

May 12, 2004.

J. Gregory Porter, Omaha, Nebraska, and Sheila K. Tipton of Dorsey & Whitney L.L.P., Des Moines, for appellant.

David J. Lynch and Cecil I. Wright, Des Moines, for appellee Iowa Utilities Board.

John R. Perkins and Jennifer C. Easler, Des Moines, for intervenor Office of Consumer Advocate.

Richard W. Lozier, Jr. of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, and Michael S. Degan of Blackwell Sanders Peper Martin, L.L.P., Omaha, Nebraska, for intervenor Aquila, Inc.

CADY, Justice.

In this appeal, we review a decision by the district court that affirmed a decision by the Iowa Utilities Board that ordered Northern Natural Gas Company to pass a tax refund to Peoples Natural Gas Company, n/k/a Aquila, Inc., for distribution to Iowa customers. We affirm the judgment of the district court.

## I. Background Facts and Proceedings.

Northern Natural Gas Company is a Delaware corporation with its principal place of business in Omaha, Nebraska. It is engaged in the transportation and sale of natural gas in interstate commerce for resale. Northern Natural Gas Company (NNG–1) was originally incorporated in 1930, and operated under its corporate name for fifty years. It did, however, develop various divisions or operating groups over time, including Peoples Natural Gas Company.

On March 28, 1980, NNG–1 changed its company name to InterNorth, Inc. (InterNorth). It also changed the name of its natural gas group operating units to Northern Natural Gas Company (NNG–2), a division of InterNorth, Peoples Natural Gas Company (Peoples), a division of InterNorth, and Energy Systems Company, a division of InterNorth. Under this new structure, InterNorth continued to operate the company's piped distribution facility under the name Northern Natural Gas Company. Peoples also continued to oper-

ate the bulk of the retail customer business. The NNG–2 division purchased gas from producers and supplied it to distributors, including Peoples. Peoples then sold the gas to the ultimate customers, including Iowa customers.

This corporate arrangement continued until December 20, 1985, when InterNorth sold the assets of Peoples to UtiliCorp United, Inc. (UtiliCorp), a Missouri corporation, pursuant to a written purchase agreement. NNG–2 continued to supply gas to Peoples, who continued to sell the gas to the ultimate customer. UtiliCorp later transferred Peoples to Aquila, Inc. (Aquila).

On April 17, 1986, InterNorth changed its name to Enron Corporation (Enron). On December 31, 1990, the board of directors of Enron discontinued NNG–2 as a division of Enron, and conveyed its assets to a newly formed subsidiary of Enron named Northern Natural Gas Company (NNG–3). It then sold NNG–3 to Dynegy, Inc. (Dynegy) on January 31, 2002, and Dynegy sold NNG–3 to MidAmerican Energy Holdings Company on August 16, 2002.

The circumstances responsible for the dispute in this case surround a refund ordered by the Federal Energy Regulatory Commission (FERC) of a tax imposed by the State of Kansas on gas producers, which the producers in turn passed on to their distributor customers, who passed the tax to the retail customer. Producer prices for natural gas at all relevant times were regulated by the National Gas Policy Act of 1978 (NGPA), which established maximum prices producers could charge their pipeline customers for natural gas. *See* 15 U.S.C. § 3311 (1988). The NGPA, however, permitted producers to charge more than the maximum levels to recover their payment of a state severance tax. *Id.* § 3320. Kansas imposed an ad valorem tax on natural gas producers, which the producers considered to be a severance tax and adjusted customer prices upward to recover payment of the tax.

Kansas began to levy its tax on the producers prior to 1983, and the producers passed the tax through increased prices to the pipeline distributors, which at the time included NNG–2, a division of InterNorth. NNG–2 paid the tax and adjusted its prices to effectively pass the tax to its customers, which included Peoples, a division of InterNorth. Peoples then adjusted its retail prices charged to retail consumers to recover the adjustment by NNG–2. In effect, the retail consumer ultimately paid the tax.

In 1993, following a long course of protracted litigation, the FERC held that the ad valorem tax levied by Kansas was not a recoverable severance tax under the NGPA. *See Colorado Interstate Gas Co.,* 65 F.E.R.C. ¶ 61,292 at 62,370–72, 1993 WL 561251 (1993). It ordered producers to refund payments they received from pipelines to recover the tax. *Id.* at 62,373. The commission further required interstate pipelines to "pass through any *ad valorem* tax refunds they receive from first sellers." *Id.* at 62,374. The objective was to pass the refund to those customers, through the chain of sales, who had actually been overcharged.

The refund order by FERC was affirmed on judicial review. *See Pub. Serv. Co. of Colorado v. Fed. Energy Regulatory Comm'n,* 91 F.3d 1478 (D.C.Cir.1996). However, the court of appeals ordered the refunds retroactive to October 4, 1983, the date when the parties were placed on notice that the tax may not be recoverable. *Id.* at 1490. The FERC then entered an order establishing the procedures and timetable for producers to refund the tax to pipelines, and the pipelines to, in turn, refund the tax to their customers. *See*

*Pub. Serv. Co. of Colorado*, 80 F.E.R.C. ¶ 61,264 (1997).

As a part of the refund distribution process, producers paid NNG–3 a lump sum amount representing its total refund. NNG–3 then divided and paid proportional shares of this refund to its various customers during the relevant period of time, with one exception. NNG–3 allocated and retained approximately $3,150,000 of the refunds representing the tax paid by Peoples from October 4, 1983, until December 20, 1985, when it was sold to UtiliCorp. Of this amount, $825,000 related to sales by Peoples to Iowa customers during the two-year period when NNG–2 and Peoples were both divisions of InterNorth and the sales between NNG–2 and Peoples constituted intracorporation transfers.

NNG–3 did not withhold the refund from Peoples because it believed the Iowa retail customers were not entitled to receive a refund, but instead claimed that Aquila, as the successor of UtiliCorp, was responsible to pay the refund to the Iowa customers pursuant to the terms of the written agreement for the sale of Peoples from InterNorth to UtiliCorp. More importantly, NNG–3 claimed FERC had no jurisdiction to order it to pass the refund on to Aquila for payment to Iowa customers.

FERC eventually determined it did not have jurisdiction over intradivision corporation sales, and consequently, held it had no jurisdiction to order NNG–3 to flow through the tax refunds to Aquila, as a successor of Peoples. *See N. Natural Gas Co.*, 101 F.E.R.C. ¶ 61,382, at 62,591 (2002). The commission later indicated the issue may be one for the Iowa Utilities Board (Utilities Board) to resolve. *Id.; see also N. Natural Gas Co.*, 104 F.E.R.C. ¶ 61,164 (2003).

After FERC declined jurisdiction, the consumer advocate division of the Iowa Department of Justice filed an application with the Utilities Board to initiate an investigation into the retention of the tax by NNG–3. The Utilities Board requested the parties to respond to its inquiry, and the matter ultimately proceeded to hearing. Additionally, litigation was commenced by Aquila in the State of Nebraska against NNG–3 in an effort to resolve the claim by NNG–3 that Aquila was contractually obligated to pay the refund to its customers.

The Utilities Board held it had jurisdiction over the refund sought by the consumer advocate because the transactions between NNG–2 and Peoples from 1983 to 1985 took place within a single corporate structure that also sold gas to Iowa customers. The board also found the retention of the tax by NNG–3 violated the refund order entered by FERC. The board ordered NNG–3 to pay Aquila the retained portion of the refund associated with retail sales to Iowa customers, and directed Aquila to submit a refund plan. The district court affirmed the order on judicial review.

NNG–3 filed an appeal and has raised three assignments of error. First, it claims the Utilities Board's jurisdiction under Iowa Code section 476.1 (2001), as previously interpreted by the board, is limited to that portion of the business of the corporation that is actually engaged in retail sales, and the board had no jurisdiction over divisions of a corporation, such as NNG–2, that are not engaged in retail sales. Thus, NNG–3 asserts that neither FERC nor the board have jurisdiction to order it to pass through the refund. Second, NNG–3 claims it has not violated the FERC refund order because the order does not apply to intradivision transfers. Finally, it claims the board's refund order was unreasonable because the board refused to defer to the Nebraska proceedings between Aquila and NNG–3.

## II.  Standard of Review.

Our review of agency action is circumscribed by the standards set forth in Iowa Code section 17A.19. *See Garcia v. Naylor Concrete Co.*, 650 N.W.2d 87, 89 (Iowa 2002). The party challenging the action has the burden of showing the agency action was invalid. Iowa Code § 17A.19(8)(*a*).

## III.  Jurisdiction.

■ The question of jurisdiction by the Utilities Board over this controversy is one of statutory interpretation. Iowa Code section 476.1 provides:

The utilities board ... shall regulate the rates and services of public utilities to the extent and in the manner hereinafter provided.

The same section then defines a "public utility" to

include any person, partnership, business association, or corporation ... owning or operating any facilities for:

1. Furnishing gas by piped distribution system ... to the public for compensation.

We have generally interpreted this section to mean that the Utilities Board has jurisdiction to regulate a business entity that furnishes gas by piped distribution to the public in such a manner that the public interest is affected. *Iowa State Commerce Comm'n v. N. Natural Gas Co.*, 161 N.W.2d 111, 115 (Iowa 1968) [hereinafter *ISCC*] In *ISCC*, a wholesale pipeline company, Northern National Gas Company (Northern), also engaged in retail sales to Iowans through a wholly owned subsidiary, Peoples Natural Gas Company (Peoples). *Id.* at 112. Additionally, it engaged in a direct line tap operation that served farm, industrial, and commercial users. *Id.* The Utilities Board, then known as the State Commerce Commission, sought to regulate the direct tap business. *Id.* Northern maintained that the commission had no jurisdiction over this portion of its business. *Id.* As a background matter, we indicated that the portion of the retail business operated by Northern through Peoples was subject to regulation by the commission, and that the only issue we faced in the case was whether the board also had jurisdiction to regulate Northern in its direct line sales to commercial, industrial, and farm users. *See id.* at 113.

Northern argued in *ISCC* that the meaning of the term "public utility" should center on the concept of "furnishing gas" only to the extent that an indefinite public has a right to demand the service. *Id.* This approach is recognized to be the traditional analysis. 64 Am.Jur.2d *Public Utilities* § 2, at 449 (2001). Yet, we rejected the approach in *ISCC* and instead analyzed a variety of factors that centered on the nature of the actual operations conducted and its effect on the public interest. Consequently, we held that Northern was a "public utility" subject to regulation by the commission based on its direct tap business. *See id.* at 117. At the same time, we made no effort to impose jurisdiction over Northern as a corporation beyond what was necessary to protect the retail consumer. Jurisdiction of the commission was extended only as necessary to address the public interest implicated.

The practical approach followed in *ISCC* is compatible with the overall approach to the regulation of gas utilities in the United States and the interplay of state and federal regulation. The NGPA confers exclusive jurisdiction upon FERC "over the transportation and sale of natural gas in interstate commerce for resale." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300–01, 108 S.Ct. 1145, 1151, 99 L.Ed.2d 316, 325–26 (1988). Beyond this point, regulation complements state juris-

diction, to avoid gaps that would allow "private interests to subvert the public welfare." *Fed. Power Comm'n v. Louisiana Power & Light Co.,* 406 U.S. 621, 631, 92 S.Ct. 1827, 1833, 32 L.Ed.2d 369, 379–80 (1972). Both the federal act and cases interpreting it recognize that states are free to regulate the natural gas industry by state utility commissions or boards in retail sales to ultimate customers. *See id.*

The Utilities Board has never considered its jurisdiction over the actions of a subsidiary or division of a corporation to be broad enough to reach a parent corporation when a subsidiary company or division of the corporation actually operates the facility that supplies gas to retail consumers. *See In re Peoples Natural Gas Co.,* 59 P.U.R.4th 93, 102 (Iowa S.C.C. 1984). Thus, it has treated divisions of the corporation as separate entities, and limits the imposition of its jurisdiction over the division or entity that provides the direct sale to the user. *Id.* Likewise, the FERC does not recognize jurisdiction over intra-division transfers within a corporation. The federal commission does not consider such transfers within the same corporation to be sales or resales under the NGPA. *See N. Natural Gas,* 101 F.E.R.C. ¶ 61,-382, at 62,591.

NNG–3 seizes on this treatment of divisions within corporations to support its claim that the Utilities Board has no jurisdiction in this case to order it to pass the refund to Peoples. It argues that the board only has jurisdiction over the successor to the Peoples division, the entity that sold the gas to the Iowa consumers. It asserts that there is no jurisdiction over the successor to the NNG–2 division that transferred the gas to Peoples. It argues that the jurisdiction of the board lies exclusively with the corporate division that sells the gas to the public.

To respond to these arguments, we return to our statute. Section 476.1(1) gives the Utilities Board authority to regulate public utilities and defines a public utility as any person or business entity owning or operating any facility that sells piped gas to the public. We think it is important to observe that this statute includes both the owner and the operator of a facility, and the various types of business entities included within the definition include corporations. *Id.* Thus, the statute clearly includes the corporate owner of a facility, not just the operator.

We next turn to our *ISCC* case to highlight some important observations. First, we never implied that the Utilities Board's jurisdiction under the statute was limited to the actual division of the corporation that operated the direct sales business. Instead, we indicated in *ISCC* that the board regulated Northern's retail gas business conducted "through Peoples National Gas Company (a wholly-owned subsidiary)." 161 N.W.2d at 112. Second, although the case dealt with the question whether there were enough direct sales by Northern to the public to make its rates and methods of operation a public concern and public interest, the practical analysis we adopted made it clear that we ultimately look to the nature of the particular business operation to determine if a public utility exists. *Id.* at 113–17. Third, we rejected the notion that a business could avoid state regulation of a public interest through its operational methods and practices. *See id.* Finally, we observed that the federal authorization to regulate a wholesale pipeline company is not necessarily comprehensive, but some dual regulation between federal and state agencies is contemplated. *See id.* at 118.

We think the statute and the approach adopted in *ISCC* means that the Utilities Board in this case not only had jurisdiction

over the Peoples division during the critical timeframe, as the operator of the business that sold gas to Iowa consumers, but also over InterNorth, the owner of the facilities that sold gas to Iowa consumers. In other words, because InterNorth was a public utility (as the owner of facilities distributing gas to Iowa consumers through its Peoples division), the board would have had jurisdiction over InterNorth to the extent necessary to regulate the rates of Peoples. Certainly, if there had been no corporate reorganizations and sales, and the refund had been made to NNG–2, a division of InterNorth, the board would have had jurisdiction to order InterNorth to transfer the refund on its corporate books to Peoples as part of the board's authority to regulate the rates of Peoples through its jurisdiction over the owner (InterNorth) of the facilities furnishing gas to Iowa consumers. NNG–3, as the successor in interest to NNG–2, now holds money that it admits should ultimately be refunded to Iowa consumers. Thus, NNG–3 is likewise subject to the board's jurisdiction for the sole purpose of ordering the transfer of the refund monies to the corporate successor to Peoples. Retail consumers in Iowa have been denied refunds solely because a particular corporate arrangement removed the original sale from federal jurisdiction. But that same corporate arrangement subjected InterNorth to the board's jurisdiction and now subjects NNG–3 to the board's jurisdiction for the limited purpose of directing that NNG–3 pay the refund to Aquila.

## IV. FERC Order.

■ NNG–3 asserts the FERC refund order does not require it to pass the refund on to the successor of Peoples, and cannot be used as the basis for the Utilities Board to order a refund. We agree that the FERC order does not require NNG–3 to transfer the refund for the disputed two-year period to Aquila. However, the only reason for this result is that FERC has concluded it has no jurisdiction over the transfer from NNG–2 to Peoples. The order otherwise culminates years of litigation over a refund intended to be passed through the pipeline to the ultimate user who paid the tax. Moreover, the order recognizes the refund process would necessarily involve both federal and state agencies to fully carry it out. Thus, once the Utilities Board assumed jurisdiction, the FERC order properly served as the basis for its action. *See Hill v. Kansas Gas Serv. Co.*, 323 F.3d 858, 861–62 (10th Cir.2003) (describing a similar assumption of jurisdiction by the Kansas Corporation Commission, an analogue to the Utilities Board).

## V. Resolution of Contract Action.

■ NNG–3 claims the Utilities Board acted unreasonably by failing to defer to the outcome of the Nebraska litigation over the refund before exercising its jurisdiction. We disagree. *Cf. Edward Rose Bldg. Co. v. Cascade Lumber Co.*, 621 N.W.2d 193, 195–96 (Iowa 2001) (describing general principles of comity between courts of different states). The refund order issued by the board does not impair any potential contract rights NNG–3 may have to require Aquila to pay the refund, and for NNG–3 to seek reimbursement. *See generally State, Dep't of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 149–50 (Iowa 2001) (discussing general principles and theories relating to recovery for unjust enrichment).

## VI. Conclusion.

We affirm the decision of the district court.

**AFFIRMED.**