MANSFIELD, Justice
(dissenting).
I respectfully dissent and would uphold the determination of the Iowa Utilities Board (the Board) that Eagle Point Solar (Eagle Point) is a public utility. To my mind, the majority opinion is a good case study on the limits of judicial competence and why the legislature wanted us to defer, in large part, to the regulatory agency.
As I read the majority opinion, my colleagues appear to be substituting their expertise on utility regulation for that of the Board. Consider the following excerpts:
There are, however, significant barriers to the installation of on-site solar energy facilities. The initial capital costs remain quite high, often in the millions of dollars or more. Some potential risk averse customers are skeptical about the ability of solar facilities to provide regular and predictable sources of energy....
[[Image here]]
... There is no reason to suspect any unusual potential for abuse. From a consumer protection standpoint, there is no reason to impose regulation on this *471 type of individualized and negotiated transaction.
[[Image here]]
... [T]he provisions of on-site solar energy are not an indispensable service that ordinarily cries out for public regulation. All of Eagle Point’s customers remain connected to the public grid, so if for some reason the solar system fails, no one goes without electric service. Although some may wish it so, behind the meter solar equipment is not an essential commodity required by all members of the public....
[[Image here]]
In addition to mitigating factors, there are also countervailing positive impacts, too. Behind the meter solar facilities tend to generate electricity during peak hours when the grid is under the greatest pressure.
(Citations omitted.)
For each of these statements, the majority provides either no supporting authority or citations to material that the majority presumably found in its own independent research.[9] Is it the proper role of courts to act as experts on the delivery of electrical energy? I would argue it is not.
The basic issue in this case is whether Eagle Point becomes a public utility under Iowa Code section 476.1 (2011) when it goes into the business of installing on-site solar energy facilities on various entities’ properties and selling the resulting electricity to those entities. I can see reasonable arguments on both sides.
The Board, after extensive proceedings, concluded that Eagle Point would become a public utility. Among other things, the Board noted that Eagle Point would be selling electricity on a per-kilowatt-hour basis to multiple customers; that this electricity would displace electricity normally provided by the public utility required to serve that territory; and that such an arrangement would undermine the tradeoff whereby the local regulated utility has the obligation to serve every customer that wants service but in return receives an exclusive territory. As the Board points out on appeal, if Eagle Point is allowed to take electricity sales away from Interstate Power and Light (Interstate Power), which has made long-term investments based on projections of customer demand and which is authorized by law to recover its costs plus a reasonable rate of return, Interstate Power’s other ratepayers could be forced to make up the difference.
These arguments could be wrong. My colleagues believe they are wrong. But I do not believe we should be deciding them.
In Renda v. Iowa Civil Rights Commission, we undertook a comprehensive review of the administrative law question that underlies this appeal. See 784 N.W.2d 8, 10-15 (Iowa 2010). Thus, we discussed at length when courts should and should not defer under Iowa Code section 17A.19 to an agency’s interpretation of statutory terms. Id.
As we emphasized in Renda, “when the statutory provision being interpreted is a substantive term within the special expér-tise of the agency, we have concluded that the agency has been vested with the authority to interpret the provisions.” Id. at 14. In fact, among the cases we cited with approval in Renda after making this statement was City of Coralville v. Iowa Utilities Board. Renda, 784 N.W.2d at 12, 14 (citing City of Coralville v. Iowa Utils. Bd., 750 N.W.2d 523, 527 (Iowa 2008)). In City *472 of Coralville, we held that public utility “rates and services” as used in Iowa Code section 476.1 was clearly vested in the Board’s interpretive discretion. See City of Coralville, 750 N.W.2d at 527.
Applying this standard from Renda, I think it would be hard to conceive of a substantive term more within the special expertise of the Board than whether a company providing electric service is operating as a “public utility.”
Renda also discussed another situation where agency deference has historically been granted by courts. This is when an agency has been given rulemaking authority and the term in question is one which the agency “must necessarily interpret ... in order to carry out its duties.... ” See Renda, 784 N.W.2d at 12 (citing, inter alia, City of Coralville, 750 N.W.2d at 527).
Those circumstances exist here as well. The Board has rulemaking authority, see Iowa Code section 476.2(1), and it must determine what a public utility is in order to carry out its duties. Hence, we have an additional Renda ground favoring deference to the agency.
Furthermore, in a number of instances in recent years, we have deferred to Board interpretations of terms within the Board’s bailiwick. See Evercom Sys., Inc. v. Iowa Utils. Bd., 805 N.W.2d 758, 762-63 (Iowa 2011) (stating that the Board’s interpretation of a provision in chapter 476 should only be reversed if it is “irrational, illogical, or wholly unjustifiable”); Office of Consumer Advocate v. Iowa Utils. Bd., 744 N.W.2d 640, 643-44 (Iowa 2008) (same); AT & T Commc’ns of the Midwest, Inc. v. Iowa Utils. Bd., 687 N.W.2d 554, 561 (Iowa 2004) (same). Evercom, it should be noted, was decided after Renda, but we nonetheless deferred to the Board’s interpretation of a “ ‘substantive term within the special expertise of the agency.’” Ever-com, 805 N.W.2d at 762-63 (quoting Ren-da, 784 N.W.2d at 14).
For all these reasons, I believe the Board has been vested with authority to interpret the term “public utility” as applied to an alternative supplier of electrical energy under section 476.1.
True, in NextEra Energy Resources LLC v. Iowa Utilities Board, this court declined to defer to the Board’s interpretation of the term “electric supply needs” as used in section 476.53(4)(c )(2). 815 N.W.2d 30, 38 (Iowa 2012). We indicated broadly that “the general assembly did not delegate to the Board interpretive power with the binding force of law.” Id. Relying on this language, Eagle Point argued here that “this Court has recently held that the Board is generally not entitled to deference in interpreting any of the provisions of Iowa Code chapter 476 because the legislature never intended to confer this power on the Board.” (Emphasis added.) Likewise, the district court below ruled:
The [NextEra ] court ... concluded ... that the “general assembly did not delegate to the Board interpretive power with the binding force of law” with regard to interpreting chapter 476. Accordingly, here the Court will examine the Board’s interpretation of the relevant sections of chapter 476 for correction of errors at law and will not give deference to the Board’s interpretation.
(Citation omitted.)
But the majority here has helpfully clarified that there is no broad no-deference rule for chapter 476 and that the Board will be given deference in appropriate cases. According to the majority, “We focus on the particular statutory provision at issue in a given case.” I agree with this clarification of the NextEra decision. See *473 NextEra, 815 N.W.2d at 50-52 (Mansfield, J., specially concurring).
So why does the majority decline to give deference to the Board in this case? The majority offers two reasons why expertise is not needed and why we should not defer to the Board’s interpretation of “public utility,” neither of which I find persuasive. First, the majority asserts the term is not complex or technical. Second, the majority asserts the term has a legislative definition.
As to the first point, I think my colleagues have missed the boat, or at least stepped aboard the wrong boat. The issue under Renda is not whether the term itself is technical or complex, in the sense that you would not encounter it in everyday speech or would need a college-level vocabulary to understand it. In fact, you can read all of Renda and not find the words “technical” or “complex.” See generally, 784 N.W.2d at 8. The issue under Renda is whether the term appears across a variety of legal contexts, such as “employee” did in Renda, or whether it appears to have a “specialized” meaning. See id. at 13-14.
Public utility is such a specialized term. Significantly, when the term is used elsewhere in the Code, chapter 476’s definition of “public utility” is frequently incorporated by reference. See, e.g., Iowa Code §§ 8D. 13(17), 306.46(2), 352.6(2)(6), 368.1(12), 455H.304(2)(d), 499.30(5), 499.33(2), 714H.4(l)(e), 716.6B(l)(a); 2013 Iowa Acts ch. 66, § 4 (codified at Iowa Code Ann. § 89.14(10) (West, Westlaw through 2014 Reg. Sess.)); 2013 Iowa Acts ch. 140, § 77 (codified at Iowa Code Ann. § 716.7(1)(6) (West, Westlaw through 2014 Reg. Sess.)). “Public utility” is not a legal concept that cuts across various fields of law; it is a concept embedded in the law relating to the supply and regulation of energy, communications, and water services.[10]
Let’s look at the standard the majority applies for determining whether Eagle Point is a public utility. The majority pulls eight factors from Iowa State Commerce Commission v. Northern Natural Gas Co., 161 N.W.2d 111, 115 (Iowa 1968), a case we decided before the Iowa Administrative Procedures Act was adopted, see 1974 Iowa Acts ch. 1090. After reviewing the factors and making the statements I quoted at the beginning of this dissent, the majority renders what it calls a “practical *474 judgment.” The majority’s practical judgment is that Eagle Point is not a public utility.
If we are talking about practical judgments, shouldn’t we defer to the Board? Reading part IV(C) of the majority opinion merely reinforces in my mind that we are trying to act as experts ourselves.
Furthermore, in Northern Natural Gas, we emphasized that the eight factors in the test really boil down to one:
The real question is: What does the statutory phrase “to the public” mean? We conclude it means sales to sufficient of the public to clothe the operation with a public interest and does not mean willingness to sell to each and every one of the public without discrimination.
161 N.W.2d at 115.[11] Is the entity selling enough energy (gas or electricity) to “clothe the operation with a public interest”? This seems to me the paradigm of something that should be decided by the regulatory agency that sees such matters every day and is in a better position to assess “the public interest.”
Another assertion in the majority opinion with which I disagree is the following:
We begin with observing that we believe the standard for determining whether a gas or electric provider is a public utility under the statute must be the same. The definition of public utility in Iowa Code section 476.1 from its inception in 1968 applied both to gas and electric providers. We see no basis in the statute for applying one test for gas suppliers and another for providers of electricity.
(Citations omitted.) Why cannot the standard be different for gas and electricity? Contrary to the majority’s claim that there is “no basis in the statute” for treating gas and electricity differently, the Board noted in its ruling two “significant” statutory differences. First, chapter 476 provides for exclusive territories for electric utilities but not gas utilities, based on a legislative determination that there should not be duplication of electric facilities. See Iowa Code § 476.25.[12] Second, section 476.1 contains a specific exclusion limited to certain providers of electricity. See id. § 476.1. *475 Both these differences favor the treatment of small-scale competitive suppliers of electricity as public utilities.
As noted by the Board, the statutory definition of public utility excludes “a person furnishing electricity to five or fewer customers either by secondary line or from an alternate energy production facility or small hydro facility, from electricity that is produced primarily for the person’s own use.” Id. Eagle Point, it seems clear, intends to furnish electricity to more than five customers (the City of Dubuque is just its first), with the electricity not produced primarily for Eagle Point’s own use. Hence, Eagle Point’s operations will be on a larger scale than anything covered by the section 476.1 exclusion. That being the case, it is logical to regard Eagle Point as a public utility. When the legislature spells out what it intended to exclude, we often infer that it intended to include what remains. See Staff Mgmt. v. Jimenez, 839 N.W.2d 640, 649 (Iowa 2013) (noting the legislature’s list of excluded persons under a workers’ compensation definition did not include undocumented workers and concluding, under the doctrine of expressio unius est exhisio alterius, “[iff the legislature intended the definition of a worker or employee to exclude undocumented workers, it would have done so by adding undocumented workers to the excluded list”).
This gets me to the majority’s second argument for not deferring to the Board. The majority points out that there is already a statutory definition of public utility in section 476.1. See Iowa Code § 476.1. And when the legislature defines a term, we have often found this presents an “insurmountable obstacle” to a determination that the agency has been vested with interpretive authority over that same term. See Iowa Dental Ass’n v. Iowa Ins. Div., 831 N.W.2d 138, 145 (Iowa 2013).
But here the statutory definition is largely circular. “Public utility” includes any entity owning or operating facilities for furnishing electricity to the “public” for compensation. See Iowa Code § 476.1(1). It is not disputed that Eagle Point owns facilities for furnishing electricity for compensation. The question is whether its activities are on a large enough scale to be considered serving the “public.” In resolving this question, the section 476.1(1) definition offers little help.
Indeed, the majority implicitly concedes this point by relying not on the statutory definition of public utility but rather on a “practical approach” that features the majority’s sundry observations on economics and energy. Contrary to the majority, I do not believe we can use the existence of a statutory definition as a reason not to defer to an agency interpretation unless we are prepared to apply that statutory definition.
Hawkeye Land Co. v. Iowa Utilities Board is a different case from the present and illustrates my point. There the issue was whether a transmission company that supplied electricity only to electrical utilities was a “public utility” itself. See 847 N.W.2d 199, 201 (Iowa 2014). We decided that under the “plain language” of the statute, a company that provided power only to utilities was not serving the public. Id. at 215-16. We also declined to defer to the Board’s interpretations of section 476.27 (the crossing statute) because (1) the legislature had provided relevant definitions, (2) the statute operated in an area (eminent domain) that was subject to constitutional requirements, and (3) the Board shared decisionmaking authority under the statute with the Iowa Department of Transportation. Id. at 208-09. None of those circumstances applies here. There is no shared authority between the Board and anyone else, the Board’s actions do not *476 have constitutional implications, and we are not relying on a legislative definition or deciding a plain language question. Rather, we are substituting our own practical judgment for the Board’s.
Thus, I would not second-guess the Board’s determination that Eagle Point’s sales of electricity are clothed with a public interest because of their potential to take sales away unpredictably from Interstate Power, which is required to make long-term investments so it can serve all customers at all times and is entitled to recoup those costs plus a reasonable rate of return from its customers. Instead, I would reverse the district court and affirm the Board’s declaratory ruling in this matter.
WATERMAN, J., joins this dissent.

. The majority opinion has many citations to nonlegal sources. These sources do not come from the recoed or the parties' briefs.

. Attempting to demonstrate that "public utility" is a more general concept extending into other fields of law, the majority cites three Iowa Code provisions that do not expressly incorporate chapter 476's definition. See Iowa Code §§ 412.5, 422.93, 480A.2. However, when you examine these three cited provisions, the majority’s effort to separate "public utility” from the chapter 476 context proves unsuccessful.
By any plausible reading, Iowa Code section 422.93 implicitly incorporates chapter 476's definition of public utility. It explains that nothing in chapter 422 "shall be construed to require the [Board] to allow or require the use of any particular method of accounting by any public utility” for rate-regulation purposes. See id. § 422.93. This is, in effect, a reference to the Board's authority under chapter 476 and a savings clause for that authority. It is not a potential source of a different definition.
Further, Iowa Code section 480A.2 largely replicates section 476. l's preexisting language. Compare Iowa Code § 476.1, with id. § 480A.2(4). This suggests that when the legislature enacted chapter 480A in 1998, see 1998 Iowa Acts ch. 1148, §§ 3-8, it did not intend to establish an independent definition.
Lastly, Iowa Code section 412.5 simply clarifies that chapter 412, which deals with municipal utility retirement systems, is limited to public utilities "managed, operated, and owned by a municipality.” See Iowa Code § 412.5. Rather than demonstrating that public utility has other accepted meanings outside the chapter 476 context, section 412.5 indicates the legislature believed the normal chapter 476 definition needed to be qualified.

. The majority says, “In order to determine whether the sales were clothed with the public interest, we utilized the eight factor ... test.” I disagree and would encourage the reader to look at Northern Natural Gas, 161 N.W.2d at 115. We actually recited the eight factors but then turned to the "clothed with a public interest” standard. Id.
Notably, in the subsequent case of Northern Natural Gas Co. v. Iowa Utilities Board, we relied primarily on the "clothed with a public interest” standard, not the eight-factor test. See 679 N.W.2d 629, 633 (Iowa 2004). We said, "We have generally interpreted [section 476.1] to mean that the Utilities Board has jurisdiction to regulate a business entity that furnishes gas by piped distribution to the public in such a manner that the public interest is affected.” Id. Although we mentioned the “variety of factors” from the previous Northern Natural Gas case, we did not apply those factors but instead followed a "practical approach” that jurisdiction of the commission should be extended “only as necessary to address the public interest implicated.” Id. On these grounds, we upheld the Board's assertion of its own jurisdiction. Id. at 634 — 35. Again, I question the qualifications of courts to apply a "practical approach” to regulation of electricity. We should leave this job to the experts at the Board.

. This section provides in part:
It is declared to be in the public interest to encourage the development of co-ordi-nated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public. In order to effect that public interest, the board may establish service areas within which specified electric utilities shall provide electric service to customers on an exclusive basis.
Iowa Code § 476.25.